Argued February 10; affirmed March 22, 1938

STEELE ET UX. *v.* PREBLE ET AL.

(77 P. (2d) 418)

Department 1.

*O. G. Larson*, of Portland (W. T. Miller, of Grants Pass, on the brief), for appellants.

*Allison Moulton*, of Medford, for respondents.

ROSSMAN, J. The complaint, in the form commonly employed in actions of ejectment, avers:

"Plaintiffs are the owners of, and entitled to the immediate possession of, those certain placer mining claims situate in Section 22-23-26 and 27 of Township 40 S. Range 7 West of the Willamette Meridian in Josephine County, Oregon, and in the Althouse unorganized Mining District in Josephine County, Oregon, along Run Gulch, and particularly described as follows: 'Big Jasper No. 1, as described in the location notice thereof, recorded on Page 513, Vol. 25, Mining Records of Josephine County, Oregon,' * * *"

Then follows similar mention of seven other mining claims. The pleading further avers:

"At a time when said real property, herein described, was unpatented, open and unappropriated mineral lands of the United States of America, plaintiffs' grantors and predecessors in interest, entered upon said lands and located the same as Placer Mining Claims, in accordance with the customs of said Mining District, the laws of the United States of America and the State of Oregon, and thereafter, and on or about the Second day of March, 1936, for a valuable consideration, transferred the Title"

to the plaintiff, A. N. Steele, who later conveyed a half interest to his co-plaintiff, Almeda E. Steele. We deem it unnecessary to mention other matters averred in the complaint. The answer, after referring to the sections and township mentioned in the complaint, states:

"The defendants have Mining Properties situated in said Sections, Township and Range, and not knowing

and not being able to determine from the description of said properties alleged to be owned by the plaintiffs as set forth in Paragraph 2 of plaintiffs' complaint, and not knowing whether the description of said properties conflicts with the properties owned by the defendants, the defendants deny''

the averments of the complaint. The answer alleges neither abandonment nor forfeiture; in short, it contains no affirmative defense. The sole issue, therefore, presented by the pleadings concerns the validity of the plaintiffs' title to the eight claims. The judgment of the circuit court was in favor of the plaintiffs.

The material parts of the location notice of Big Jasper No. 1, which is dated March 1, 1922, and which was recorded March 14, 1922, are:

"This claim is located in the Althouse mining district on the Run Gulch in Sec. 27 and 26. Starting at the west center end stake about 20 ft. N. westerly from cabin runing North Easterly 300 ft. to stake No. 1 thence South Easterly 1500 ft. to stake No. 2, thence South Westerly 300 ft. along the west line of the Cougar Mining claim to the East center end stake thence South Westerly 300 ft. to Stake No. 3, thence North westerly 1500 ft. to stake No. 4, thence North Easterly 300 ft. to the starting point.

"This claim shall be known as Claim No. 1 of the Big Jasper Group.

"This is not a re-location, but is filed as an amended location to correct error in description of ground in the original notice of location and is not intended to avoid the required representation work. And that I intend to hold the work said above described claim as provided by the local laws and regulations, and the customs, and rules of mines and mining statutes, and laws of the United States."

The defendant, C. A. Roemhild, concedes that he has no interest in any property claimed by the plaintiffs. The defendant, B. E. Leonard, expressly dis-

avowed all claims that had been made in his behalf by the defendant, E. P. Preble, and delivered to the plaintiffs, voluntarily, a quitclaim for all property claimed by them. None of the other defendants, twelve in number, testified with the exception of the defendant, E. P. Preble, and it is evident that the interest which they claim is based entirely upon Preble's efforts, and is subject to any defense applicable to him. The appellants insist that the plaintiffs failed to comply with the statutes applicable to the acquisition of mining claims when they made their locations; that later they abandoned the claims; that still later Preble discovered quartz ledges upon the property involved in this action, and that he then pursued suitable means to acquire the property as quartz claims. Preble swore that when he made his locations no stakes, monuments, or boundary lines of any previous claim could be seen. Specifically, the appellants contend that the descriptions of the plaintiffs' claims in the location notices and in the complaint are inadequate; that the evidence shows that the boundary lines were never marked; and that it also shows that eventually the claims were abandoned. Further the appellants contend that the evidence fails to indicate that gold was discovered before the location notices were filed, and that it likewise fails to indicate that the annual assessment work was done.

We shall now give a brief review of the evidence, confining it largely to the parts favorable to the verdict.

In Josephine county there is an unorganized mining district known as the Althouse district. It apparently takes its name from Althouse creek which flows through the district. Flowing into Althouse creek from the east is a very crooked creek about two miles long known as The Run. It is at the bottom of a deep canyon called Run Gulch. According to the evidence offered by the

plaintiffs there is no gold in the sides or walls of this canyon, but there is in the gravel beds at the bottom. These afford opportunities for placer mining. The record indicates that from very early days miners have been along the course of Run Gulch, and every witness in this case appeared to be familiar with its name and location. For instance, Ira R. Sheaffer, a witness for the plaintiffs, swore that Run Gulch is well known and that "anybody ought to be able to find that * * *. Anyone can find Run Gulch." A plat of it appears in the office of the county surveyor of Josephine county and maps in the office of the assessor of the same county contain representations of it.

Some years prior to 1921 four individuals, Lloyd, Conner, Bean and Fetterly, went along Run Gulch and located five placer claims. They set stakes defining the boundaries of their claims and filed for record in Josephine county copies of the notices which they apparently posted on their discoveries. Lloyd built a cabin upon his claim and a few feet from it Conner built one on his own claim. Another prospector built a cabin about 2,000 feet farther up the gulch. In 1921, Sheaffer, acting for himself and some associates, agreed to purchase, and, in the winter of 1921, did purchase, these five mining claims. They constitute five of the eight claims mentioned in the complaint. In the spring of 1922 Sheaffer, believing that the location notices were inadequate, prepared and recorded amended notices. As a witness, he said: "We re-staked them, cut the lines and in every way went ahead and laid them out so that they could be found by anybody at any time." Further, he declared: "We cut them out and blazed them so they could be easily found. Of course, we didn't make what you call a direct line. We didn't cut down trees or anything of that kind, but we cut down the

brush. We blazed the line on the trees so they could be readily seen. We put a stake at the center of each end and also each corner as required by the law." He fastened a location notice, so he testified, on each claim "describing the claim and just where the stakes could be found". At the same time his father located a placer claim in the same gulch, his nephew located another, and a friend located a third. Their boundaries were marked and the location notices were posted and recorded like the other five. These three with the other five comprise the eight claims involved in this action. Before the conveyance to the plaintiffs the record title of all eight claims stood in the names of Ira R. and Ella E. Sheaffer, husband and wife.

Sheaffer produced a pencil map of the eight claims. It makes no mention of township, range or section numbers. The central feature of the drawing is Run Gulch. It shows that five of the claims are 600 feet in width and approximately 1,500 feet in length. The other three are also 600 feet in width but are substantially less than 1,500 feet in length. Five of the claims lengthwise straddle Run Gulch. The claim known as Jasper No. 1, which is 600 feet in width but less than 1,500 feet in length, is at the place where Run creek empties into Althouse creek. Run creek divides this claim lengthwise into two parts. Along the course of the creek immediately east of Jasper No. 1 are, one after another, Cub Bear No. 1, Cub Bear No. 2, Jasper No. 2, and Cougar. They, together with Jasper No. 1, are the claims that straddle the creek. Adjacent on the north to Cub Bear No. 2 and Jasper No. 2 are Jasper No. 4 and Jasper No. 5, each 600 feet in width but somewhat less than 1,500 feet in length. Adjacent on the south to Cub Bear No. 2 and Jasper No. 2 is Jasper No. 3. Thus, for more than a mile five of the claims stretch

along the two-mile gulch with Run creek flowing through them. And since near the central part of these five, and adjacent to them on the north, are two more of the claims with the eighth adjoining on the south, the claims assume, roughly, the form of a Latin cross. The stem is slightly bent, due to the fact that the claims follow the course of the creek.

■ The descriptions contained in the location notices appear to conform to this plat with the exception of the names of two or three of the claims. This error was explained by Sheaffer and apparently misled no one. At any rate, no one but he mentioned it. In the circuit court where ample opportunity was available, the defendant made no effort to show that the location notices and this plat did not harmonize. They, however, call to our attention the following portion of the location notice for Big Jasper claim No. 2: "In Aulthouse Mining District, on Run Gulch, Sec. 27 starting at Center East and stake '25 feet from cabin, running N. Easterly 3000 ft. to Stake No. 1 * * *." They argue that since there were three cabins in the gulch it is impossible to determine which cabin is meant by this reference. However, the proof indicates that one of these cabins was approximately 2,000 feet from the other two, was sadly dilapidated and was unused. The witnesses scarcely mentioned it. The other two, as already indicated, were within a few feet of each other. We believe that anyone who was making an honest attempt to find the boundary lines of this claim could determine which cabin was meant. The following facts, among others, would help him. The location notice states that stake No. 1 was set 3,000 feet northeasterly from the selected cabin. The location notice for Big Jasper No. 1 states: "Starting at the west center end stake about 20 ft. N. westerly from cabin runing

* * *.'' Again, all the notices continuously refer to the lines established by the others, thereby affording opportunity to check boundary lines against boundary lines. Moreover, Sheaffer testified: ''The two cabins set very close together, as there was only that one particular room, and Conner and Lloyd went in and they located and there was no other place for a cabin, although originally men took up the claims, as I understand it, many years before. They set a stake first near the cabin on each side. That was to be the center end stake of their claims they laid together, and for that reason the stake was close to the cabins.'' The defendant, E. P. Preble, in 1931, saw a location notice on the door of one of these cabins posted there by a miner named Dick Kingery. Another early prospector had used the cabin for similar purposes. These circumstances indicate that the cabin was deemed by miners a natural object, suitable for identification purposes, and that its use had not led to any confusion in running out boundaries. So far as we can determine, the plat to which we have been referring constitutes a correct portrayal of the eight claims.

When Fetterly and his associates made their locations the country was in its primitive condition and neither the government nor anyone else had made a survey of it. Sheaffer, referring to these early locations, declared: ''They were located before there were any surveys in there, long, long before, and they were, as I get it, they were relocated once afterward, but still run on the old lines or thereabout.'' He swore that when he made the relocation he did not start from any point established by a survey, but that the lines ''were run according to the gulch, the way they had been laid out and always had been * * * we followed the old original stakes and lines as near as pos-

sible.'' It is uncertain from his testimony whether a survey of this country had been started before he made his relocation, but he was sure that if the survey had been started all of the land had not been surveyed. He swore, ''There was no possible way for me to find any of the corners when I was up in there. * * * If the stakes had ever been set they were either set in some spot where they couldn't be found or had been destroyed.'' The country was mountainous and crossed by deep, rocky canyons which, according to Sheaffer, made it impracticable to conform lines to surveys.

Immediately after the amended locations had been filed Sheaffer proceeded with placer mining operations. Referring to himself and his brother, he said, ''We worked every winter, going in in the fall as soon as there was ample water.'' A stream known as Trefathen ditch crossed the northeast corner of Jasper No. 4 and after flowing across some unclaimed land entered upon the Cougar claim and then emptied into Run creek The Sheaffers purchased the water rights in Trefathen ditch and recorded their deed. This property right was entered upon the county assessor's records as owned by the Sheaffers and they paid an annual tax upon it. Sheaffer testified that they constructed two reservoirs and ''we had about 2500 feet of pipe and two No. 3 giants.'' In this way the claims were worked from 1922 until 1928, Sheaffer claiming that in that interval ''we done all the assessment work on all of them and much more''. About 1928 Sheaffer's brother was injured and the two men decided to sell the property. First, an individual by the name of Ed Hogan purchased the property, went upon it and worked it for a while, but later the transaction was rescinded. Then one by the name of Harry Akerill operated the property under a lease. February 26, 1932, the Sheaffers and one C. A. Roem-

hild executed a lease covering the eight claims and the mining equipment upon the property. Sheaffer swore that between 1928 when he ceased work upon the property until 1932 when Roemhild went into possession an ample amount of work was done to meet the assessment requirements. We quote from him: "There was from three to four men working all the time, and stayed in the summer when they couldn't work and laid pipe and cleaned ditches and done everything that was to be done, worked on trails, etc." The Roemhild lease gave Roemhild possession for two years with an option for a two-year extension. He stayed for the four-year term and was still upon the property at the time of the trial. The defendant Preble, who lived upon the property since 1931, was asked, "He (Roemhild) did, in good faith, go ahead and mine the property of Mr. Sheaffer according to the lease?" and replied, "I think he did; I think he spent a lot of money when he first went in there." The record indicates that Roemhild used the aforementioned Sheaffer equipment and not only worked the property himself but had two or three helpers. Sheaffer swore that during Roemhild's occupancy more than enough work was done annually to meet requirements. However, at times he filed assessment exemptions rather than proof of work, declaring that Roemhild's unfriendliness made it difficult to obtain the needed statement. No one contradicted any of the evidence which showed that the required work had been done ever since Sheaffer made his purchase in 1922. As a witness for the defendants, Roemhild referred to the property as "the Sheaffer mine". Another of the defendants' witnesses, Dick Kingery, who entered this mining district in 1931, testified, "I started prospecting up The Run there and I came up by this Sheaffer place—what they call the

Sheaffer place''. In other words, the property involved in this proceeding had come to be known by the Sheaffer name and was still so known after the Sheaffers were no longer working upon it.

While Roemhild was in possession the defendant, E. P. Preble, joined him. Referring to Preble, Sheaffer declared, ''I don't know just when he moved on, but as far as I know, the first he was on he was sent down as a mining engineer from Portland to look at the property for a man I was talking of selling to.'' According to Sheaffer, Preble returned about a week later and inquired concerning this property. Sheaffer swore that he told him, ''I own the property there, and it was leased to Roemhild * * * I marked it out for him and explained it all to him, as he talked at that time as though he might want to buy a little later on.'' Later, according to Sheaffer, Preble somehow became associated with Roemhild in the operation of this property. Sheaffer testified positively that when Roemhild went into possession the stakes indicating the boundaries of the eight claims were in position, and declared, ''Certainly, I saw stakes up to the last few times I was in there.'' In reply to a question which asked him to specify the time when he last saw the stakes, he answered, ''Some time after Mr. Roemhild had been in there—I can't tell you just how long, but all at once there wasn't any stakes to be found.'' He stated that in 1933 Preble asked him where his mining claims were located and that ''I told him where they were * * * I told him five claims along the Run Gulch through Althouse creek. I can't see why anybody couldn't understand that plain enough.'' He then indicated the manner in which he explained to Preble the location of the other three claims which, it will be recalled, are not directly upon the creek. After the

Roemhild lease, but before Preble had filed his claims, Sheaffer and Roemhild had some sort of litigation in a justice-of-the-peace court concerning the lease, in the course of which Sheaffer described the property, voiced his ownership, and produced the Roemhild lease. Preble was present in the courtroom when this testimony was given. Preble testified that when he first came upon the property in 1932 he became acquainted with Roemhild who then "said that he had just started in, and he said that a man by the name of Sheaffer and he was working it under a lease. Well, I said, just where is your ground here—where do you go? Well, he said he didn't know exactly. But he hadn't time to show me, or whether he didn't want to or couldn't I don't know." He also testified that at that time he saw Sheaffer's giants and pipe and even inquired whether Sheaffer would be willing to sell them. Preble appeared to be familiar with all of the terms of the Sheaffer-Roemhild lease and mentioned various of its details, after which he said, "That is all in the lease." The lease names each of the eight claims and gives the volume and page of the public records where the location notices are recorded. Preble admitted that he had consulted the recorder's records.

E. A. Schollhorn, who testified that he went upon this property in May, 1934, at Preble's suggestion, and worked there for about a year, swore that Preble met him as he approached the property "and we went up over No. 8 trail and as we passed the reservoir up there he showed me about where the Sheaffer line was run through." To the question, "And whose property did he say the reservoir was on?" he replied, "Mr. Sheaffer's." He next testified, "He (Preble) said that he was going in with Mr. Roemhild on it with the intention of buying it off Mr. Sheaffer". He swore

that after he had worked upon the place for some time Preble "said that the Trefathen ditch was open to the location of water rights and that he was going to take a water right and make Sheaffer sell out at his own price and get it much cheaper." Schollhorn swore that these matters were mentioned frequently at the dinner table, and then testified: "Toward the last he (Preble) began to say that—he spoke about relocating all of the claims in the district and that the claims wasn't located rightly, and they had no stakes, no lines or that they was all recorded wrong, and that he was going to locate all of the claims and Mr. Sheaffer was out." He described an incident when he saw the corner stake from one of the Jasper claims pulled out of the ground and thrown into a fire. He also said, "There was one lying down between the two cabins and which, as a miner, I was surprised to see, a mining stake laying on the ground, and I asked Mr. Preble about it and he said that a mule had scratched against it and knocked it over."

A. N. Steele testified that he purchased this property from the Sheaffers March 2, 1936. Before buying it he visited it and while there he encountered Preble who told him, "Mr. Sheaffer owns it". After he had made the purchase he returned and, according to his testimony, Preble then informed him that he (Preble) was the owner. We quote from Steele's testimony: "Yes, he said Mr. Sheaffer had not kept up his assessment work and had not kept up the stakes and all that stuff, and that he had filed on it and it was his."

Only one item of evidence remains to be mentioned. Sheaffer was asked, "Do you know in what sections this property is laid out?" and replied, "I couldn't tell you." Appellants make much of this. The words last quoted are immediately followed by "as there was no

possible way for me to find any of the corners when I was up in there." As a witness, Sheaffer was shown a drawing which purported to be a map of Sections 22, 23, 26 and 27 of Township 40 south, Range 7 west of the Willamette Meridian. It shows Run Gulch, a portion of Althouse creek, and other like geographical features. Straddling Run Gulch are representations of the five Sheaffer claims which lie directly in the gulch. These five, according to the plat, are in Sections 22, 26 and 27. Upon the plat immediately to the north of two of these five are representations of two more of the claims. One of these two is partly in all four of the sections, while the other extends into three of them. To the south of the five is a representation of the eighth claim, which appears to lie partly in Sections 26 and 27. Upon being shown this map Sheaffer swore that it was a correct representation of the general topography of the country and of the Sheaffer claims. Plaintiffs' attorney then declared that he had traced the section lines from a plat on file in the assessor's office and that his tracings were correct. After he had made the tracing Sheaffer added the lines which constitute the representations of the mining claims. Following these explanations the map was offered in evidence, whereupon the defendants' counsel stated: "So long as it is a tracing we object to it—it doesn't mean anything." The trial judge then asked some questions of Sheaffer who swore that he knew the claims were in the sections represented by the map because "one thing I have to go by is the claims lay on the creek and the creek as drawed on the assessor's plats here should be correct." Several more questions were then asked of Sheaffer who thereupon located the claims by streams and gulches previously unmentioned. Then the presiding judge, referring to this map, ruled:

"It may be admitted." This ruling brought neither protest, objection nor exception. No contention is made upon appeal that the document was inadmissible, and it is not the subject matter of any assignment of error. The appellants offered no map of the district and no testimony indicating that the eight claims are not in the sections just mentioned. They, of course, contend that their quartz claims cover the properties which the plaintiffs seek to recover in this section. The above is the only evidence in the record showing that the plaintiffs' claims are in the sections mentioned in the complaint.

■ The first assignment of error presented by the appellants is based upon a contention that the complaint does not state a cause of action. Specifically, the appellants contend that a "complaint in ejectment of mining claims does not state facts sufficient to constitute a cause of action where the property is not described with such certainty that the sheriff can deliver possession if a recovery be had." They cite section 5-104, Oregon Code 1930; *Security Savings & Trust Co. v. Ogden*, 123 Or. 370 (261 P. 69), and *Young v. Papst*, 148 Or. 678 (37 P. (2d) 359). The section of our code just mentioned declares: "The property shall be described with such certainty as to enable the possession thereof to be delivered if a recovery be had."

■ *Security Savings & Trust Co. v. Ogden*, supra, like the action now before us, was for ejectment. It is true, as the appellants point out, that that decision states:

"The sufficiency of the description is tested by whether the sheriff, in the event the plaintiff prevailed, could identify the property and carry into execution the writ of possession."

But that is not by any means all that the decision states. It continues:

"Reference in a description may be made to court records." That statement is followed by citation of several decisions among which is *Bagley v. Bloch*, 83 Or. 607 (163 P. 425), wherein the reference, as in the present case, was to a recorded instrument by volume and page. Following the above-quoted language recourse was had to the maxim, "That will be considered certain which can be made certain." Further, the decision stated:

"Plaintiff, by its complaint, has, with a reasonable degree of certainty, apprised defendant of the particular land which it claims to own. * * * We are of the opinion that the description is sufficient. A surveyor would have had no trouble in locating the land. The strict rule relative to descriptions of property in pleadings as announced in some of the older cases has, in modern practice, been much relaxed: Glacier Mountain Silver Mining Co. v. Willis, 127 U. S. 471, 32 L. Ed. 172, 8 S. Ct. 1214; 19 C. J. 1107."

*Young v. Papst*, supra, was an ejectment action to determine the title and right to possession of eight placer mining claims. The answer tendered all of the defenses upon which the appellants in the present action depend—by appropriate averments, however. One of these defenses was that the description of the land in the amended complaint was so indefinite that a sheriff could not identify it. Another claimed that a fatal discrepancy existed between the descriptions contained in the original complaint and those set forth in the amended complaint. As is shown in a diagram forming a part of the decision, the two descriptions failed, by a wide margin, to harmonize. This was due to the fact that the posted notices, which did not correspond with the claims as actually marked out upon the ground, were used in the original complaint, while the amended

complaint employed the boundaries indicated by the stakes. The locator in preparing his notices had mistaken directions. As Mr. Justice BELT pointed out, "He was neither a surveyor nor a lawyer." Although the land had been surveyed by the government, the evidence and notices failed to tie the claims to any government corner. The notices, unlike the ones with which we are now concerned, misdescribed the claims. The decision, after quoting the above-mentioned part of section 5-104, Oregon Code 1930, and citing *Security Savings & Trust Co. v. Ogden*, supra, stated:

"One of the principal contentions of the appellants is that the land described in the amended complaint is so indefinite and uncertain that a sheriff could not identify the same."

Nevertheless, the decision held that the defendants' demurrer had been properly overruled and that the amended complaint was sufficient. In *Glacier Mining Co. v. Willis*, supra, cited in our above-reviewed decision entitled *Security Savings & Trust Co. v. Ogden*, the complaint alleged that the locators of the mining claims therein involved

"marked the boundaries of their said location and commenced to run a tunnel into said Glacier Mountain. * * * They caused to be made out and recorded in the recorder's office of the county of Summit aforesaid a location certificate of said tunnel claim, which certificate described the location and boundaries of said tunel claim. The said tunnel claim was by its locators named the Silver Gate tunnel claim, and is described more fully as follows: Commencing at the base of said Glacier Mountain east of Bear Creek, and running southeast and parallel with Coley tunnel through said mountain five thousand feet from the mouth or starting point of said tunnel at a stake marked and in or at the mouth of said Silver Gate tunnel, and two hundred and fifty feet northeast and two hundred and fifty feet southwest from said stake or tunnel to its

termination. Said tunnel site is situate on Glacier Mountain in Snake River mining district, county of Summit and State of Colorado, and is five thousand feet in length by five hundred feet in width.''

A demurrer challenged the sufficiency of the complaint upon the ground that ''the property sought to be recovered in this action is not described by its legal subdivisions nor by its metes and bounds.'' In holding that the lower court had erroneously sustained this demurrer, the federal supreme court said:

''We think this description is sufficiently plain and distinct to enable the sheriff in case of a recovery to execute a writ of possession, or to enable a surveyor to ascertain the exact limits of the location. The strict rule of pleading which formerly required exact accuracy in the description of premises sought to be recovered, has, in modern practice, been relaxed, and a general description of the property held to be good. The provisions of state statutes as to the description of the premises by metes and bounds, have been held to be only directory, and a description by name where the property is well known is often sufficient.''

In the present instance, the complaint specifies the township and sections in which the alleged mining claims are situated. It identifies each claim by name and designates the mining district and division thereof (Run Gulch) in which the claims are located. Further, it refers by volume and page to the recorded notices, and by consulting that recorded information (which, as we have seen, we may properly do) we gain specific information about the claims, the starting point, directions, distances, lengths, widths and surroundings. The appellants, however, point to the fact that the location notice for Big Jasper No. 2 states:

''In Aulthouse Mining District on Run Gulch, Sec. 27 starting at Center East end stake '25 ft. from cabin, running * * *''

They claim that since this location notice does not state in which direction from the cabin the start is to be made, nor designate which of the three cabins is the one intended, the description is fatally defective. However, we are now concerned, not with the evidence but with the sufficiency of the complaint, and the latter mentions only one cabin. Further, the description continues:

"N. Easterly 3000 ft. to Stake No. 1, thence N. Westerly 1500 ft. to stake No. 2, thence 300 ft. S. Westerly 'on line of Cub Bear Claim' to West center end stake thence S. Westerly 300 ft. 'on line of Cub Bear Claim,' to stake No. 3 thence 1500 ft. S. Easterly to stake No. 4, thence 300 ft. N. Easterly 'on line of Big Jasper No. 1' to starting point."

Again, the location notices of all the claims refer back and forth to one another, thus tying in the stakes, natural objects and permanent monuments mentioned in each with those of the others. Thus, an individual who was making an honest attempt to determine the boundary of Big Jasper No. 2 would have as his beginning point a stake, with knowledge that it was 25 feet from a cabin and also 3,000 feet northeasterly from another stake. Should he still be in doubt the description contained in this notice advises him of the stakes and lines of two more of the claims. Cabins, gulches, mining stakes and shafts, being the permanent objects and monuments mentioned in these location notices, are permissible objects for that purpose: 40 C. J., Mines and Minerals, p. 806, § 220. More than one witness swore that the location notices would enable anyone to locate the claims. While we are not at liberty to consider that testimony in determining the sufficiency of the descriptions alleged in the complaint, we know of no reason for believing that the descriptions

cannot guide an intelligent surveyor to the property. Of course, the property must be described with sufficient certainty to enable the sheriff to deliver possession to the successful plaintiff, but that does not mean that in all instances reference must be made to lines established by surveys. 30 U. S. C. A., § 35, provides:

"All placer mining claims located after the 10th of May, 1872, shall conform as near as practicable with the United States system of public land surveys."

Section 28 of the same statute provides:

"The location must be distinctly marked on the ground so that its boundaries can be readily traced. All records of mining claims made after May 10, 1872 shall contain the name or names of the locators, the date of the location, and such description of the claim or claims located by reference to some natural object or permanent monument as will identify the claim." See also § 53-201, Oregon Code 1930.

 It will be observed that claims located after May 10, 1872, must conform "as near as practicable with the United States system of public lands and surveys." The complaint does not disclose whether the Althouse mining district was surveyed prior to the time the plaintiffs' claims were established. We observe, however, "as, under the circumstances, gulch claims cannot practicably be conformed to legal subdivisions, it is sufficient if they conform as near as is reasonably practicable.": Ricketts, American Mining Law, p. 143, § 204. In *Young v. Papst*, supra, in which the district had been surveyed and the notices failed to tie the claims to any government corner, the claims were, nevertheless, upheld, the decision stating:

"If it had been practicable for the plaintiff in the location of the claims to conform to legal subdivisions as established by the government survey, he would be required to so locate them."

From Lindley on Mines (3d Ed.), § 381, we quote:

"In the initiation of rights upon public mineral lands, as well as in the various steps taken by the miner to perfect his location, his proceedings are to be regarded with indulgence, and the notices required invariably receive at the hands of the courts a liberal construction * * *. The pioneer prospector, as a rule, is neither a lawyer nor a surveyor."

If the law of ejectment is to be of any avail to miners in unsurveyed lands it must accept descriptions of the kind set forth in the complaint. A mining claim is a valuable property right and the miner who, in obtaining it, complied with the laws regulating his action, is as much entitled to the protection afforded by ejectment proceedings as any other individual who claims a trespass upon his property. Therefore, while the description of such a claim may not employ the specific language which describes a downtown city lot, nevertheless the courts must do the best they can with the description at hand, always bearing in mind that the acts of Congress permit the location notice to be couched in layman's language, and that the prospector is frequently working in gulches and canyons which renders it difficult to run true courses. As a practical matter there appears to be no reason why these claims cannot be readily located. Apparently no difficulty was encountered in *Young v. Papst*, supra. Should difficulties arise a sheriff can always avail himself of the help of a surveyor or of an attorney. Based upon the decisions above reviewed, it is our opinion that the descriptions are sufficient to warrant a conclusion that the complaint states a cause of action. We find no merit in this assignment of error.

The second assignment of error, which is also the last, follows: "The court erred in denying appellant's motion for dismissal notwithstanding the verdict of

the jury." In support of this assignment of error, it is stated: "A valid location of a placer claim must be made to conform to the statutory requirements, of discovery of gold or other precious metals, doing the discovery work, marking the corners with suitable monuments, doing the yearly assessment work or claiming exemption therefrom, as provided by law, and the location notice must describe the property with reasonable certainty." In addition to contending that these requirements were not obeyed by the plaintiffs and their predecessors, the appellants also contend that the evidence shows that the plaintiffs and their predecessors "have done no assessment work since 1928," and that the claims were abandoned by them.

In arguing in behalf of this assignment of error, the appellants make virtually the same attack upon the evidence that their first assignment of error made upon the complaint. They contend that the boundaries of the claims were not properly marked, and that the reference "starting at Center east and stake '25 ft. from cabin" is indefinite in view of the fact that the evidence discloses that three cabins stood upon the claims. What has already been said suffices, we believe, to dispose of the second of these two contentions.

The purpose of posting a notice and marking the boundary lines is to inform and guide others who may wish to make locations in that vicinity. But one who has knowledge of the boundaries of a mining claim cannot complain of the absence of stakes, monuments, etc., which are intended to identify the boundary lines: 30 U. S. C. A., p. 170, footnote 87. Likewise, he cannot complain because of a defect in the posted notice: 30 U. S. C. A., p. 175, footnote 120. The plaintiffs presented evidence that Preble, before making his locations, had detailed information of the extent, nature and location of the plaintiffs' claims. According to Schollhorn,

Preble pointed out to him one of the lines. Accordingly, a mere defect in the lines or notices could avail the defendants nothing. The markings, etc., that must be made upon the ground are described in *Wright v. Lyons*, 45 Or. 167 (77 P. 81). It will be recalled that in marking the lines, trees were blazed and the intervening brush was cut down. Stakes of the required size were driven into the ground in the appropriate places. A stake near the aforementioned cabin was used as a starting point for some of the lines which, in turn, referred to the boundary lines of some of the other claims. Others of the notices referred not only to stakes but also to a shaft. We have already cited an authority which points out that shafts, cabins, a gulch, and well-known mining claims can be deemed permanent objects within the contemplation of the previously cited mining statutes. See also *Allen v. Dunlap*, 24 Or. 229 (33 P. 675). We believe that the aforementioned map of Sections 22, 23, 26 and 27 is some evidence that plaintiffs' claims are in those sections. Possibly, in the absence of a certificate, the plat was inadmissible, but the ruling which finally admitted the tracing into the evidence met with no objection and is not challenged upon appeal. This evidence, uncontradicted and unchallenged by any other evidence, suffices for its designed purpose. We are satisfied that Sheaffer and his predecessors made the proper markings upon the ground and posted and recorded the proper notices.

██ The defendants, in arguing in behalf of this assignment of error, point out that a claim 600 by 1,500 feet in area contains more than 20 acres. Twenty acres is the maximum size of a placer claim: 30 U. S. C. A., § 34. Due to the fact that the country was rocky and mountainous, and that he had no surveying instruments, Sheaffer was not certain that the lines which he ran out

would measure exactly 600 by 1,500 feet. Only five of the claims appear to be 1,500 feet in length, and since these five are not exactly parallelograms it may be that when their lines are measured by a surveyor it will be found that they contain less than 20 acres. Fetterly's original notices expressly limited each of his claims to 20 acres. If they contain more than that amount the excess manifestly will be slight. No one contends that Sheaffer or his predecessors were prompted by bad faith or that they were undertaking to gain more for themselves than our laws permit. Three of the claims contain much less than 20 acres. The excess in the other five claims, if any, being slight could not of itself be an indication of bad faith. Under these circumstances, if any of the claims are too large the invalidity affects only the excess: *Gohres v. Illinois Mining Co.*, 40 Or. 516 (67 P. 666); 40 C. J., Mines and Minerals, p. 790, § 190, and 30 U. S. C. A., p. 297, footnote 19.

The intimation contained in the appellants' above-quoted language that the evidence fails to prove a discovery of gold on the eight claims is, possibly, based upon a belief that the discovery of the gold must precede the location. The mining statutes, however, do not expressly require a discovery before other acts of location. In the present instance there is an abundance of evidence that gold was discovered and taken from the property in substantial quantities before the defendant Preble entered upon the property. The requirements of the statute were, therefore, fully met: *Sharkey v. Candiana*, 48 Or. 112 (85 P. 219, 7 L. R. A. (N. S.) 791); *La Grande Investment Co. v. Shaw*, 44 Or. 416 (72 P. 795, 74 P. 919); *Crown Point Mining Co. v. Crismon*, 39 Or. 364 (65 P. 87); 40 C. J., Mines and Minerals, p. 786, § 181; 30 U. S. C. A., p. 79, footnote 115. Again, we

observe in *Thomas v. South Butte Mining Co.*, 211 Fed. 105, the following:

"Where mining claims which have passed out of the hands of the original owners have stood unchallenged for years, and have been developed to a considerable extent, the certificate of location, if in due form, may be deemed presumptive evidence of discovery and of a valid location. Vogel v. Warsing, 146 Fed. 949, 77 C. C. A. 199; Cheesman v. Hart (C. C.) 42 Fed. 98."

In the present instance the certificates of location are in proper form and the evidence indicates that Sheaffer, his predecessors and associates built upon the property three cabins, constructed two reservoirs, installed upon the property equipment in the form of pipes and giants, acquired the water rights in Trefathen ditch, and sunk some shafts. All of this work was done upon these claims. The evidence also indicates that the placer mining operations were conducted to such an extent that the water in Althouse creek some miles below these claims plainly showed the colorations attendant upon such operations. Under these circumstances the location certificates of themselves created a disputable presumption of discovery.

The mere fact that the stakes were no longer in place when Preble claims that he made his locations did not of necessity invalidate the plaintiffs' claims: *Young v. Papst*, supra. From an annotation appearing in 30 U. S. C. A., p. 169, footnote 85, we quote:

"The general rule is that when a location is once sufficiently marked on the surface so that its boundaries can be readily traced, and all other acts of location are performed as required by law, the right of possession is fully evidenced in the locator and he cannot be divested of this right by the removal or obliteration or destruction of the monuments, stakes, marks or notices done without his fault. * * *"

In the present instance evidence, which the jury apparently believed, indicated that the boundary lines

of these claims were originally properly marked, and that if destruction or obliteration of the marks had occurred the fault lay, not with the plaintiffs but possibly with Preble. This being true, the destruction of the marks did not affect the rights of the plaintiffs.

■■ A mining claim is, of course, subject to abandonment. The answer contains no mention of abandonment. As was said by Mr. Justice RAND in *Oliver v. Burg*, 154 Or. 1 (58 P. (2d) 245),

"However, it seems to be settled by all the decisions that, whether forfeiture or abandonment be pleaded or not, the party relying upon it has the burden of proof to show such forfeiture or abandonment."

Some of the decisions declare that in order to establish abandonment there must be clear and convincing evidence thereof. See 40 C. J., Mines and Minerals, p. 842, § 296. There was much evidence in this case that the plaintiffs and their predecessors had no thought of abandoning these claims and that work was continuously in progress upon the property. The jury evidently believed this testimony. This contention is without merit.

■ It was not necessary that Sheaffer and his successors should personally perform the annual work. Work performed by anyone in privity with the locator inures to his benefit: Lindley on Mines, (3d Ed.), § 633, and 40 C. J., Mines and Minerals, p. 830, § 270. There is ample evidence in the record to justify a finding in favor of the plaintiffs that sufficient yearly work was done by those in privity with them to meet the requirements.

We conclude that the second assignment of error reveals no merit.

The judgment of the circuit court is affirmed.

BEAN, C. J., and KELLY and BAILEY, JJ., concur.