GLOBE MINING COMPANY, a Wyoming Corporation,

*Plaintiff and Appellant*

vs.

KARL JOHN ANDERSON, GEORGE E. FAIRFIELD and H. J. BEACH,

Defendants and Respondents.

(No. 2761; November 19, 1957; 318 Pac. (2d) 373.)

18

20

For the plaintiff and appellant, the cause was submitted upon the brief of W. T. Schwartz, William H. Brown, Jr., and G. Joseph Cardine, all of Casper, Wyoming, and oral argument by Mr. Schwartz and Mr. Brown.

For the defendants and respondents, the cause was submitted upon the brief of Smith & Nicholas of Lander, Wyoming, and oral argument by W. A. Smith and W. J. Nicholas.

Heard before Blume, C.J., Parker, J., and McAvoy, D. J.

24

## OPINION

Mr. Justice Parker delivered the opinion of the court.

Plaintiff,[1] Globe Mining Company, successor in interest to the partnership of H. D. Hand and Page T. Jenkins, brought a suit in Fremont County to quiet title on ten lode mining claims, Phil Nos.3—12. Plaintiff alleged that, as relating to said land, beginning October 2, 1953, it had complied with Federal and Wyoming mining laws pertaining to location of lode claims but in defiance of plaintiff's interest defendants had entered upon said claims May 5, 1955, overstaking same and attempting to initiate rights therein. On May 12, 1955, the court issued a temporary restraining order against defendants who thereafter filed an answer and cross-petition, denying any rights of plaintiff, alleging themselves to be the legal owners of a substantial portion of said lands by virtue of compliance with the Federal and Wyoming mining

---

[1]Use of the term "plaintiff" throughout the opinion includes plaintiff and its predecessors in interest.

laws on their five lode claims, Andria and Andria Nos. 1—4, and praying that title be quieted in them.[2]

The trial court in "findings of fact," expressing views on the law as well as the facts, decided against plaintiff and in favor of defendants, entering judgment accordingly. From the judgment plaintiff has appealed, filing fifty-six specifications of error, fifty-one of these complaining of erroneous findings, two of improper rulings on the admission of evidence, one of the court's basing judgment on its view of the premises, and one on the denial of plaintiff's application to reopen the case for the receiving of evidence of the Atomic Energy Commission's work performed on plaintiff's claims.

In brief the background of the litigation is as follows: In September 1953 plaintiff by means of airborne scintillation counter determined that there was a highly radioactive anomaly in the area; in October examined the ground on foot, determined its geology to consist of the Wind River formation, a coarse sandstone lying in a relatively horizonal bed or lode with a radioactive count ranging from two to seven times a normal background, took samples from that portion of the area later staked as Phil Nos. 5, 6, 8, and 10, posted location notices, staked the ground, and caused signed copies of the notices to be recorded with the county clerk. In November plaintiff caused a discovery pit or cut to be dug on each of the claims, arranging with a mining engineer to take samples and assay them. (An effort was made to prove that in April 1954 the A. E. C. through some understanding

---

[2]Map showing all claims in controversy follows this opinion.

with plaintiff performed drilling work on the claims and made certain assays from samples taken from the claims, but this evidence encountered objection and was excluded by the court.) Beginning in July 1954 Stanley Grant, a geology student sponsored by plaintiff, made a study of the region, including the Phil claims, with a view to completing a thesis for a master's degree in geology. In August and September 1954 the American Smelting and Refining Company under a lease arrangement with plaintiff made some reconnaissance of the area embraced by the claims, taking at least one sample and preparing an isorad map. On December 31, 1954, the American Smelting and Refining Company relinquished its lease to plaintiff; and plaintiff then employed Eldridge Lockhart as mining superintendent to look after some 120 claims which plaintiff had in that vicinity and get "the area in hand so that it could be explored and exploited." Beginning in late December 1954 or early January 1955 and continuing into March, Lockhart according to his testimony did some shallow digging on Phil Nos. 5, 6, 7, and 8 and blocked out material which he later expected to mine.

In May 1955 the defendants discovered the anomaly by airborne means, inspected the ground, decided it was of value, and believing that plaintiff's location was defective took steps to locate the Andria claims in an area principally within that covered by Phil Nos. 3—12, precipitating the action now under consideration.

The trial court in the "findings of fact" lists four essential steps for establishing a valid lode mining claim under the Federal and Wyoming statutes as "discovery," "discovery working," "marking of boundaries," and "filing of certificates of location."

It would serve little purpose to pursue the arguments of the parties on the various specifications of error since the ultimate determination of the case depends largely upon the measure of plaintiff's compliance with the statutes in accomplishing the four requisite steps.

This court in a case relating to the title of lode mining claims has previously enunciated the well-settled rule that "unless the judgment is without support in, or is clearly against the weight of, the evidence, it will not be set aside." Columbia Copper Min. Co. v. Duchess Mining, Milling & Smelting Co., 13 Wyo. 244, 79 P. 385, 387. Accordingly, it is desirable that we view the findings herein to determine whether or not each portion thereof is supported by or is clearly against the weight of the evidence, accepting that which is supported and rejecting that which is unsupported.

Proceeding then to "discovery" we find that under the Federal statute "no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located." R.S. § 2320 (1878), 30 U.S.C. § 23 (1952 ed.).

The parties hereto do not insist that the mining statutes relating to the location of lode claims are inapplicable in the present situation. Nevertheless, a search of the record and a review of current thinking seem to indicate that secondary uranium deposits do not usually occur within clearly defined veins of country rock in the same manner as do most of the minerals with which earlier cases are concerned. Plaintiff both in its evidence and argument stressed the fact that the mineralized area under litigation consisted of a "horizontal lode." The court repeated this testimony, tacitly, if not actually, approving same; and defend-

ants, calling attention to the fact that plaintiff has merely *assumed* such a vein, nevertheless do not challenge it.

The trial court indicated that there must be a discovery of valuable mineral "in a lead, lode, ledge or vein or rock in place," using each of these terms synonymously; and no question has been raised by the parties as to this interpretation.[3] Accordingly, we need not pursue any detailed definition of the word lode[4] but instead shall look to the evidence of the parties and the findings of the court.

In the "findings of fact," the court stated that plaintiff took:

"* * * three samples from the area within the boundaries of what was later staked as Phil Claims numbered

---

[3]Plaintiff did not contend that the earth above the sandstone layers of the Wind River formation was within the trial court's definition of a "lead, lode, ledge, or vein or rock in place." In fact, Jenkins testified as follows:

"Q. * * * what formation does the uranium occur in? A. It occurs in the Wind River formation and within the Wind River formation in sandstone layers.

"Q. Does that sandstone outcrop in any way in this area? A. Yes, it outcrops all over the ridge covered by the Phil group.

"Q. What were you attempting to do by the method in which you laid out your Phil claims? A. We were attempting to cover what we believed to be the ore body or the vein or lode in which uranium minerals of commercial quantity were contained."

Plaintiff thus relying upon the discovery of uranium *within the standstone layers* was obligated to identify the discovery samples as having been taken there-

6 and 8 and at a point on the boundary line between Phil Claims 5 and 6. The evidence does not disclose that these samples were taken from a vein or rock in place. When assayed they showed the presence of uranium."

This positive finding of the discovery of uranium on these three claims, which finding is borne out by the evidence and is unquestioned by the defendants, presents a situation requiring a review of the evidence as to the nature of the *place* from which these assay samples were taken.

On this point Hand testified that on October 6, 1953, from Pit A on what later became Phil No. 6, he took a sample, chiseling a channel down the side of the pit through yellow mineralization "in place"; from Pit A-2 on what later became a midway point in the center end line between Phil Nos. 5 and 6, he took a sample from "mineralization in place"; and from Pit A-3

---

from and if he failed to do so could not complain of the court's ruling that the samples were not shown to have been taken from a "vein or rock in place."

[4]Uncertainty presently exists regarding the type of claim by which a disseminated uranium deposit of epigenetic origin should be located. Divergent viewpoints on this subject seem well illustrated in the following statements:

" * * * Normally * * * a discovery [of uranium] at depth would be classified as a *lode* or *vein*, though an exception to this rule arises in the case of buried channels of ancient rivers which, historically, have been classified as *placers*. * * *" (Emphasis supplied.) 101 Cong. Rec., p. 9196, 81st answer (being a portion of the questions and answers developed during the panel discussions of the Wyoming Stock Growers Association, June 9, 1955, and the Wyoming Natural

on what later became Phil No. 8, he took a sample from "rock in place" and stated that this was sampled "in the same manner as the other two." The assays of these samples by the Brown Laboratory were admitted in evidence as Exhibit 6 without objection and showed quantities of $U_3O_8$ as well as $V_2O_5$, on which analyses the court apparently relied in finding that the samples "showed the presence of uranium." The above-mentioned evidence standing uncontradicted as it does must be taken as conclusive proof of plaintiff's discovery of secondary uranium in a *vein* or *rock in place.*

The trial court found that with the exception of the discoveries on Phil Nos. 5, 6, and 8 Hand took no samples or assays from the other Phil claims; that Newman and Hewitt in 1954 collected samples from a pit on Phil No. 8, which when assayed showed uranium; that Grant in 1954 obtained some mixed samples,

---

Resources Board, June 10, 1955, and later reported to Congress by Senator Barrett).

"* * * the locatable mineral [uranium] should be classified as lode or placer. A 'lode' is a vein or 'aggregation of metal embedded in quartz or other rock in place,' while a 'placer' is a location of minerals 'found loose in sand or gravel and not in the vein or in place.' Though the distinction is essential there is uncertainty, and the Utah court has stated that 'lode' is a practical, nonexacting miner's term. The test is the character of the deposit ('rock in place') rather than the type of mineral involved. Whether to locate uranium as a lode or placer is in doubt since uranium minerals have been found in every formation in the Colorado Plateau and in no definite pattern. While some vertical deposits of uranium in fractures are now being mined the predominant formation is horizontal, being 'flat-bedded' and 'isolated' as are the

the assays of which showed uranium; and indicates that no further assays were taken. The evidence disclosed by the record substantiates this latter finding. A report of assay (Exhibit 27) disclosed uranium in samples taken from various of these claims, but there was nothing to show that this was from *rock in place.* There was an attempt made to introduce evidence of the assays of samples taken from drilling by the A. E. C. o nPhil Nos. 4, 5, and 6 (Exhibit 28); but this evidence was correctly rejected by the court for lack of proper foundation after plaintiff's witness, Jenkins, had stated:

"All I can say is that we send very few samples to the Atomic Energy Commission for assay, and this would be a case where just by deductive reasoning I am sure that these are samples that we took from the Phil 4. 5 and 6 claims and sent to the Atomic Energy Commission. * * * I can't positively say that these samples passed from my hands to the Atomic Energy Commission."

host rock sediments. Since uranium deposits found in fractures should clearly be located as lodes, and most other uranium deposits are produced from ores which 'interfinger with mudstones or silt stones' so that they are generally considered by the mining industry to be lodes, it is herein assumed that uranium mining claims should properly be so located." 4 Utah L.Rev. 239, 244, 245.

"* * * the deposits of uranium in the shinarump sands were epigenetic. That is to say, carried into the formation by some solution after the host rock was laid. While the decisions of courts which have dealt with the problems do not make the epigenetic feature a necessary characteristic of a lode formation, it is important in this case in that it indicates in some degree that the formations above and below the shinarump sands were less penetrable by the solution carrying the uranium ores and therefore became boundaries to

Thus, there was no evidence of a sampling and assaying of a vein, lode or rock in place in Phil Nos. 3, 4, 7, 9, 10, 11, and 12 and, therefore, no discovery on these claims—unless we recognize the readings of electrical instruments such as scintillation and Geiger counters as sufficient to support discovery. This we are reluctant to do, since such contours while helpful in prosspecting for uranium cannot be relied upon as the *only* test. For instance, plaintiff's witness, Grant, testifying about his general investigation on the subject, said that in certain areas where the background count was high an assay showed no uranium. To the same general effect see Nininger, Minerals for Atomic Energy, 2d ed., pp. 37 and 73. Thus, with the exception of Phil Nos. 5, 6, and 8, there is no evidence in the record on which to base discovery of a vein, lode, or mineral bearing rock in place within the limits of any Phil claim. This is required by both the Federal and Wyoming statutes relating to lode claims, and

---

the zone of mineralization. What I have stated is not to be interpreted as a conclusion on my part that in all cases the boundaries of a lode deposit must consist of country rock so different from the host rock that it does not or cannot contain in some degree mineralization like that of the host rock. In other words, I find and believe from what I have heard in this case and in the investigation I have made bearing upon the issues involved that the boundary of a lode deposit may be fixed by the impoverishment of the mass beyond the limits of profitable extraction." Ula Uranium, Inc., v. Allen (an unappealed case from the District Court of San Juan County, Utah, the foregoing being an excerpt from Judge F. W. Keller's Memorandum Decision, dated October 6, 1956).

Ambiguity in legal interpretations regarding the location of mining claims for this apparently vital mineral may be more than merely frustrating and expensive

plaintiff is obligated to sustain the burden of proof in that respect. See 40 C.J. pp. 883 and 884; 58 C.J.S., Mines and Minerals § 123a. Plaintiff did not meet this burden as to Phil Nos. 3, 4, 7, 9, 10, 11, and 12 by a presentation of competent evidence showing the situation as to each claim. It follows that those Phil claims stand invalid and may not receive further attention herein.

Adverting then to Phil Nos. 5, 6, and 8 on which the court has found discovery of mineral, the evidence showing it to be in *rock in place,* we next consider the findings of the court on the subject of discovery workings on the three claims. Some of the statements made are worthy of quotation:

"The pit on Phil 5 Claim is cut across the south shoulder of a steep hill or slope immediately adjacent to the discovery stake at which an actual original discovery was made. This pit is shown on Plaintiff's Exhibit 3

---

to well-intentioned prospectors. It may seriously retard a crucial industry by undue litigation, ultimately forcing a new method of mining development to be adopted by legislative action—such as the withdrawal of public land from mineral entry and the reservation of same for acquisition by lease, as is presently done with petroleum. Whether or not this might be desirable is not for judicial decision but is a matter for legislative determination. Meanwhile, there could be irreparable loss, both public and private. Accordingly, we would perhaps be remiss if we did not express our views on the subject.

A commonly used definition of a lode is "a body of mineral, or mineral-bearing rock, within defined boundaries in the general mass of the mountain." 1 Lindley on Mines, 3d ed., p. 656. This definition has been most often applied to discussions of primary deposits of minerals. It is significant that at the time

to be only 8½ feet deep, and the Court places the original depth at nine feet, allowing for one-half foot of silt washed into the deepest part of the cut, which was determined by digging down to solid rock by the writer at the deepest point of the cut. There is at least one foot of dirt or overburden at the top of the cut, making a total exposed vein or rock in place of only eight feet in height. In the words of the witness Hand, the top six feet of this formation is a rusty brown sandstone with two feet of conglomerate lens at the bottom. This last strata is apparently the only true vein matter to be found in the cut.

\* \* \* \* \* \* \* \* \*

"\* \* \* pit P-6B was apparently dug by the A. E. C. This pit is deep enough and long enough to meet the statutory requirements and exposes a vein of mineralized material, but it is not located on the center line of the claim.

\* \* \* \* \* \* \* \* \*

"The pit on Phil 8 is about 145 feet south and west of the discovery stake. The surrounding terrain is relatively flat and should be classified as a shaft rather

---

of the enactment of R. S. § 2320 (1878) those minerals in which this Nation was most interested often occurred in fissures and along weak lines in rock. For that reason, many decisions have emphasized the fact that a vein or lode must have "well defined boundaries." Some courts recognized that many ore deposits possessed all the essential attributes of lodes even though they did not have well defined boundaries in the original sense. However, the words "well defined boundaries" became so firmly ensconced in the legal vocabulary that they often haunted the decisions. Today, the economic necessity of modern civilization has created a need for minerals which by geologic chance frequently occur in ill defined or formless masses. Many of these were deposited epigenetically, i. e., by mineral in solution (a) permeating between grains and crystals of the country rock, (b) replacing certain existing formations, and (c) filling cracks, crevices,

than an open cut. It is eleven feet deep with about one foot of dirt on top. A vein of light, brown sandstone with streaks of medium and coarse gravel is exposed for a depth of ten feet in height and over ten feet in length. Again, this pit is not located on the center line of the claim as staked.

"In conclusion, the Court finds that none of the discovery work relied upon by the plaintiff was performed in substantial compliance with the Wyoming statute, either because no vein at all was cut or the vein exposed was not cut for the required ten feet in length and ten feet in height or the work was not performed on the center line of the claim."

In analyzing the statement that plaintiff's discovery work on these three claims failed of substantial compliance with the Wyoming statutes, we consider first the evidence regarding the depth of the three pits. Jenkins and Brown testified positively that the pit on each of the claims was dug to a depth of at least ten feet in November 1953. There was no testimony

---

and pore spaces—*after* the surrounding rock had been laid down. See Page, Stocking, and Smith, Contributions to the Geology of Uranium and Thorium, International Conference, 1955—Geological Survey Professional Paper 300, pp. 41 and 97; Niniger, Minerals for Atomic Energy, 2d ed., p. 21 ff. Therefore, even though *placer, vein,* and *lode* are primarily miners' terms, evolved for practical rather than technical meaning, the scientific definitions of these words as used by geologists become important in legal considerations.

Such definitions by various authors writing on geological subjects vary to some extent but in general are remarkably uniform, and we think may be fairly summarized as: A *placer* is a deposit of heavy minerals concentrated mechanically; a *vein* is a deposit of minerals formed in weaknesses in the earth's crust either by injection of molten rock or by water solution mov-

to the contrary and apparently the court was convinced on the point because the findings do not list insufficient depth as a defect.

Whether the trial court meant to find that a vein was not exposed for the length of ten feet on Phil Nos. 5 and 6 is not fully apparent from a perusal of the conclusion reached. (The findings classified the "pit on Phil 8 * * * as a shaft rather than an open cut"; and, therefore, the ten-foot length requirement is inapplicable.) The findings show that the pit on Phil No. 6 was "long enough." As to Phil No. 5, they are ambiguous but reasonably interpreted indicate a substantial compliance with § 57-917, W.C.S.1945, as to length.

We turn then to the alleged implication in the findings that a vein must be exposed for ten feet in height. Any such interpretation is in conflict with §§ 57-916

---

ing through openings and depositing minerals in and along such openings or in replacement of materials already there; a *lode* is a portion of the earth containing several veins spaced closely enough together so that all of them together with the intervening rock can be mined as a unit. See generally Longwell and Flint, Introduction to Physical Geology, 1955, p. 382; Emmons, Thiel, Stauffer, and Allison, Geology: Principles and Processes, 4th ed., p. 597; and Longwell, Knopf, and Flint, Physical Geology, 3d ed., p. 531.

These geological definitions indicate that the basic characteristic of a vein is the origin of the deposit contained therein. However, the earlier decisions usually dealt with minerals which by nature tended to form largely in cracks and crevices so that courts and administrative agencies found no occasion to consider the origin of the mineral as important but instead relied entirely on its form as being confined within nar-

and 57-917, W.C.S.1945, which provide respectively that the shaft be sunk to the "depth of ten feet from the lowest part of the rim of such shaft at the surface" and "any open cut * * * with face ten feet in height." The references are clearly to the depth of the "shaft" (or "cut") and not to the height of the vein.

The statement that "pit P-6B was apparently dug by the A. E. C.," though not traceable to the court's conclusion, merits some comment. There is no testimony to support this finding and no contention that it made any difference. In fact, defendants in their brief said "the court did not find that this pit was dug by the AEC, but merely commented that it may have been dug by the AEC."

The court's last-mentioned reason for holding that plaintiff had not substantially complied with the statutes as to discovery work was that the work was not performed on the center line of the claim. Surpris-

---

row, definite boundaries. They often used such rigid definitions of lode as "mineral lying within well defined seams or fissures in the surrounding rock," 36 Am.Jur., Mines and Minerals § 70, or "any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock," 58 C.J.S., Mines and Minerals § 3 at p. 31—sometimes saying, "The critical test is the manner in which the deposit occurs rather than the origin of the deposit," U.S. Gypsum Co., 60 I.D. 24, 25. Fortunately, there has been some much-needed recognition of the fact that such rigid definitions cannot be of universal application but rather must be tempered by scientific findings as to the nature of the deposits under consideration. For instance in the case of Moulton Mining Co. v. Anaconda Copper Mining Co., 9 Cir., 23 F.2d 811, 814, the court said:
"* * * while the existence or nonexistence of a vein is often dependent upon mixed questions of law and fact,

ingly, defendants fail to concur with the trial court on this point and in their brief state that:

"* * * the court did not hold that such a failure invalidates a claim in Wyoming, but merely pointed out that such failure was just one more instance in which the appellant had failed to substantially comply with the mining laws of Wyoming. * * *"

The difficulty seems to stem from the fact that plaintiff disregarded the first paragraph of § 57-916 (requiring the discovery shaft or cut to be dug before the filing of a location certificate), recorded the location notices with the county clerk, and thereafter performed the discovery work at points some distance from the discovery monuments. The statute on its face seems positive in the requirement that the discovery work be done prior to the filing of the location certificate, but this view has long since been tempered by judicial decision. In Dean v. Omaha-Wyoming Oil

---

in this instance the evidence of mineral showing and of the physical characteristics of a vein are so strong that as a matter of law the only conclusion that could properly be reached was that it was a vein. Fundamentally, of course, we are guided by the well-recognized knowledge that in the complexities of lodes, with indefinite and irregular walls, while the mineral association of rock in place is an essential element in the definition, the nature of the material, the form of the deposit, and the character of the boundaries are often variant (Lindley on Mines, § 294, p. 265; Iron Silver Co. v. Cheesman, 116 U.S. 529, 6 S.Ct. 481, 29 L.Ed. 712; Star Mining Co. v. Federal Mining Co. [C.C.A.] 265 F. 881), and that it is not necessary for the formation of a disseminated lode that there should be any walls or any sheering. 'It simply requires a more or less porous rock through which the solutions may pass. * * * They may have indefinite boundaries.' [This quote is a portion of the illuminating views of

Co., 21 Wyo. 133, 128 P. 881, 883, 129 P. 1023 the court stated:

"* * * while it may be said that discovery should chronologically precede the acts of location it may follow, instead of preceding, such acts, and will be held good as against all who have not acquired intervening rights (Costigan on Min. Law, p. 160; Beals v. Cone, 27 Colo. 473, 62 Pac. 948, 83 Am.St. Rep. 92; Ervin v. Perego, 93 Fed. 608, 35 C.C.A. 482; Lindley on Mines, § 330)."

In the instant case, plaintiff's placing the cart before the horse by posting the location notices and recording same before sinking a shaft or making a cut failed of strict compliance with the statute. But under accepted interpretation a challenger who insists on such acts being done in the proper order cannot be heard to complain if discovery occurs before his rights intervene. The trial court found that there had been discovery workings on these three claims long before de-

---

Winchell, a mining engineer who testified in the Star case, supra at 891, 892, and apparently fully convinced the court of appeals.] Thus, while what are spoken of as structural boundaries are not always necessary to constitute a vein or lode, there must be ore bodies coming from the same source, impressed with the same form, and appearing to have been created by the same processes."

The views thus expressed would seem to apply to disseminated, epigenetic deposits of uranium. Under this interpretation, except as specifically provided by State or Federal laws, various portions of a mineral-bearing area coming from the same general source and found to have been created by the same processes of deposit *from solution* constitute a *lode* (rock in place) for the purpose of locating mining claims even

fendants appeared on the scene, and they could not validly question plaintiff's delayed compliance with the statute. Nevertheless, defendants may take advantage of plaintiff's failure to place the discovery shaft at a point other than midway between the designated side lines since such moving of the discovery shaft inevitably limits the width of the claim to which a locator is entitled. Section 57-913, W.C.S. 1945, states:

"The width of any lode claim located within Wyoming shall not exceed three hundred [300] feet on each side of the discovery shaft, the discovery shaft being always equally distant from the side lines of the claims. * * *"

As we interpret this definitive statute, it means that in no instance may a claim extend to more than 300 feet from the center point between the side lines. A deviation of the discovery shaft from the original center point cannot alter the position of the side line

---

though they may be formless and are not enclosed by definite boundaries.

A correlative matter not raised in the present case but inextricably a part of the over-all situation is the application of the extralateral rights doctrine, apex law, to lode mining claims of the type discussed in this note. No precedent is available, and the perplexities surrounding the general interpretation and application of the apex law (see I Lindley on Mines, 3d ed., p. 678 ff.) are heightened by semiofficial discussions of the subject as applied to the location of uranium claims. For instance the 86th question and answer of Senator Barrett's previously mentioned report, 101 Cong. Rec., p. 9197, reads:

"Question. Does the apex and other lode claim laws apply to uranium claims?

"Answer. Yes, if the deposit is in rock in place. It is

closest thereto, but automatically delimits the position of the other side line to a point "equally distant" from the discovery shaft. We find no litigation of identical problems, probably because the Wyoming statute is unique; but in the past there has arisen the question of a locator including within his claim an area in excess of the statutory limit by reason of some error in measurement. 2 Lindley on Mines, 3d ed., p. 827, states:

"The courts uniformly hold that such a location, where it injures no one at the time it is made is not unreasonably excessive, and where it has been made in good faith, is voidable only to the extent of the excess." To the same effect is the case of Hawley v. Romney, 42 Idaho 645, 247 P. 1069, 1071, in which the court said:

"* * * The fact that the discovery points are not in the center of the claims would not invalidate them. Where the locators extend their claims too far, it would

---

understood that in Colorado and Utah the miners have agreed not to recognize the apex law as applied to uranium deposits. Assuming similar conditions in Wyoming it might be advisable for the miners there to consider the making of similar agreements since by so doing they may avert many future controversies."

We find no instance of such an agreement and doubt that voluntary arrangements would be so generally accepted as to be effective in the industry, unless they should be sponsored by mining districts. In the absence of a solution either by cooperation or by legislation, the question will undoubtedly be one for judicial determination, with every case being resolved upon its own facts. Meanwhile, it would appear that the extra-lateral rights doctrine could apply to claims for the location of uranium *only* if there existed a well defined, continuous vein, lode, or ledge, extending downward vertically and being clearly traceable.

seem that they do not on that account lose their right to the ground they were entitled to take. Flynn Group Mining Co. v. Murphy, 18 Idaho 226, 109 P. 851, 138 Am.St.Rep. 201; 2 Lindley on Mines (3d Ed.) § 362. * * *"

Such philosophy would seem to govern in the present situation. Plaintiff must lose that part of his claim which is in excess of the amount allowed by the statute.

To summarize this phase of the case, our analysis of the record shows that by undisputed evidence plaintiff complied substantially with the requirements of the statutes as to discovery workings on Phil Nos. 5, 6, and 8; and the trial court's findings to the contrary were, therefore, in error.

We pass then to the question of the adequacy of plaintiff's erection of monuments on these three claims. Defendants had actual knowledge of the existence of the Phil claims, consulted the county records, traced some of the boundaries on the ground, and saw certain stakes, notices, and workings. There is no contention that they followed each and every boundary or that each and all of the stakes and notices were under observation by them; but it is abundantly clear that they knew of the existence of plaintiff's claims in a general way, had access to the records, and actually did consult them. These records disclose with reasonable certainty the boundaries of the claims. It is true that each "location notice" filed in the office of the county clerk of Fremont County on October 19, 1953, referred to a "discovery monument" which the evidence showed to be at a point other than the discovery shaft; and the "location notice" to that extent was defective. Nevertheless, it put defendants on notice as to each claim. Beach testified that Fairfield had looked at

the Phil claim filings in the records of Fremont County and that he, Beach, later went back with Fairfield to doublecheck; defendants in their brief said that their witnesses testified that they had little difficulty in tracing the outside corners of the claims.

We think the holding in Scoggin v. Miller, 64 Wyo. 206, 189 P.2d 677, 688, is applicable.

"* * * it may be proper also to observe that there seems to be considerable criticism made by the plaintiffs that the timbers four inches square, twenty to thirty inches long used by the M-R locators to designate the surface boundaries of their claims were not 'substantial posts' as required by Section 57-921, W.C.S. 1945 * * *. It would seem that there are several answers which can properly be made to this complaint. * * * plaintiffs having actual knowledge of the boundaries of the claims, are in no position to raise this question. * * *

"It seems the plaintiff had no difficulty in readily observing these timbers. * * *"

The trial court, having listed as a final requirement for the valid location of a lode mining claim the filing of a certificate of location, found that the only documents filed for record by the plaintiff herein were the "amended location certificates" presented for recordation after defendants had entered upon the property. Thus, in effect, the court held that the "location notices" recorded by plaintiff on October 19, 1953, were nullities.

We are obligated, therefore, to analyze and discuss this phase of the findings in the light of all the facts and circumstances. Important in any such examination is the reason for the existence of a requirement. We do not know what was in the minds of the mem-

bers of the legislature when the statutes now §§ 57-914 and 57-915, W.C.S.1945, were passed; and the views of leading students specializing in mining law are, therefore, more or less compelling. 2 Lindley on Mines, 3d ed., p. 892, states:

"By the term 'certificate of location,' we mean the instrument prepared by the locator after the completion of the development work and the marking of his location, which certificate is required by the state laws or local rules to be recorded. This instrument when recorded is a statutory writing affecting realty, being, in the states or localities where it is required, the basis of the miner's 'right of exclusive possession' of his mining location granted by the laws of congress. It is the first muniment of his paper title, upon the record of which proceedings for patent are based, and as recorded is intended to impart constructive notice to all subsequent locators of the existence of the claim, its precise locality and extent, as the marking of the location on the ground is intended to impart actual notice of these facts. The preliminary posted notice performs a *temporary* function; the recorded certificate a more *permanent* one. * * *" (Emphasis supplied.)

According to this view a significant function of the records of the certificate is the constructive notice thereby imparted. This court has not heretofore affirmatively adopted this view but has done so by implication in the case of Scoggin v. Miller, supra at 686, and again in Hagerman v. Thompson, 68 Wyo. 515, 235 P.2d 750, 756, quoting from Steele v. Preble, 158 Or. 641, 77 P.2d 418, 428:

" 'The purpose of posting a notice and marking the boundary lines is to inform and guide others who may wish to make locations in that vicinity. But one who has knowledge of the boundaries of a mining claim cannot complain of the absence of stakes, monuments, etc., which are intended to identify the boundary

lines. * * * Likewise, he cannot complain because of a defect in the posted notice. * * *' "

The discussion of this court in Columbia Copper Min. Co. v. Duchess Mining & Smelting Co., 13 Wyo. 244, 79 P. 385, 387, has a bearing, although indirect, upon the views of this court. In that case the appellant contended that the notices *posted* did not comply with the requirements of § 2546, R.S. 1899 (now § 57-914, W.C.S.1945), relating to recordation; but the court held that the notices therein substantially complied with the law. These very brief notices read:

" 'We, the undersigned, claim by right of discovery this ledge, lode, or deposit described as follows: Fifteen hundred feet in a northwesterly direction from this notice, and three hundred feet on each side of this vein. Dated this 17th day of July A. D. 1901.' "

It is significant to note that the court did not there distinguish between the posting of notices and the recordation of certificates of location, nor indicate in what respect the appellee's notices had substantially complied with the law. After studying that case in the light of the facts disclosed by the record in the instant litigation, we now extend our previously expressed views to hold that in the absence of a contrary statement by the legislature the primary purpose of requiring mining claim location certificates to be recorded is the imparting of permanent constructive notice concerning the acts claimed to have been performed by the locator.

The law is well established that, where there is actual notice, constructive notice becomes unnecessary. "* * * generally speaking, constructive or imputed and actual notice have the same effect, and either constructive notice or actual notice is binding independently of the other. * * *" 66 C.J.S., Notice § 19.

"* * * It—constructive notice—is the law's substitute for actual notice, and to say that it and actual notice are equivalents would seem to carry the self-evidence of an axiom. * * *" Butte & Superior Copper Co. v. Clark-Montana Realty Co., 249 U.S. 12, 27, 39 S.Ct. 231, 63 L.Ed 447.

The general law relating to the necessity for recording mining claims is well stated in 58 C.J.S., Mines and Minerals § 50:

"* * * in many of the mining states and territories it is required either by statute or under local district rules and regulations that an instrument describing the claim and variously called a 'location notice,' a 'certificate of location,' or a 'declaratory statement,' shall be prepared and filed for record as one of the acts of location. This requirement, however, is regarded as merely directory; if the doing of the acts required to make a valid location is fully proved by other testimony, and the statute or rule providing for the record makes no provisions for forfeiture for a failure to record, a mere failure to file, for record, a proper certificate or statement does not invalidate the location, especially as against one who has knowledge of the prior location. * * *"

Perhaps the best known case on the subject at hand is that of Zerres v. Vanina, C.C.D.Nev., 134 F. 610, 618, in which Judge Hawley construed the mining laws of Nevada which contained a provision "that 'any record of the location of a lode mining claim which shall not contain all the requirements made in this section shall be void'" (similar to § 57-915, W.C.S. 1945). He stated at 620:

"* * * there is no provision in the section of the statute under consideration, 'that a failure to comply with its terms will work a forfeiture.' And in my opinion, the statute requiring the certificate of location to be recorded, when broadly and liberally interpreted, in

order to secure the purposes for which it was enacted, is not susceptible of any such construction."

The facts in the Zerres case although not identical with the one at bar are so close as to be persuasive. The principle thus enunciated was later adopted by the Nevada court in Ford v. Campbell, 29 Nev. 578, 92 P. 206, 208, where it was said:

"* * * If it is a necessary step to perfect a valid location, and a failure to make a valid record works a forfeiture of prior existing rights, such legislation must be found clearly expressed in our state statute. * * *"

Defendants, having knowledge of the existence of the Phil claims, will not be heard to raise an imperfect recordation of certificates of location as a defect of which they can take advantage. For us to hold otherwise would be a repudiation of our often expressed view that where a locator attempts in good faith to comply with the law the courts are inclined to be liberal in construing his acts so as not to defeat his claim by technical criticism. See Hagerman v. Thompson, 68 Wyo. 515, 235 P.2d 750, 758. Of course, each case must be determined on its own facts; and a locator who fails to record his location certificate inevitably imperils his rights to the claim as against any subsequent innocent person who is not informed either actually or constructively of the location.

Plaintiff alleges as error the trial court's denial of plaintiff's application to set the judgment aside and reopen the case for admission of additional evidence regarding work performed on Phil claims by the A. E. C. It will be remembered that evidence on this subject was offered by plaintiff at the time of the trial and was properly excluded because insufficient foun-

dation had been laid. After the first brief had been filed in the lower court and before judgment had been entered, the Wyoming Supreme Court in Simmons v. Muir, 75 Wyo., 44 291 P.2d 810, issued a decision which held substantially that the assessment work done by others on a mining claim may be credited to the locator. Plaintiff would now seem to argue that the Simmons ruling changed the effect of the A. E. C. work as it might be directed to the question of discovery. We cannot agree, for it is apparent that plaintiff was then fully aware of the entire situation relating to the work performed by the A. E. C. and neglected initially to take proper steps to present such evidence or to make an offer of proof when the proffered evidence was rejected. In Shaul v. Colorado Fuel & Iron Co., 46 Wyo. 549, 30 P.2d 478, 480, cited by plaintiff as authority for reopening, this court stated:

"* * * It is settled in this state that during the term the court has the power to set aside a judgment entered during the same term, with the restriction only that the power be exercised within a sound discretion. Mitter v. Black Diamond Coal Co., 28 Wyo. 439, 206 P. 152; McGinnis v. Beatty, 28 Wyo. 328, 204 P. 340. * * *"

As we view the matter, the trial court's refusal to reopen the case was not an abuse of discretion since nothing new could have been presented.

Plaintiff also alleges as error the trial court's observations of the premises in controversy and a reliance on such observations as a basis for the findings and conclusions in the case. As has been pointed out, plaintiff failed to sustain the burden of proof as to the discovery of mineral in a "vein or lode" within the limits of Phil Nos. 3, 4, 7, 9, 10, 11, and 12; and any such claimed "observations" could have had no

bearing on plaintiff's failure. Thus, there could have been no prejudicial error on this point.

In summarization, the evidence showed plaintiff to have complied substantially with the requirements of the statutes relating to discovery and discovery workings on Phil Nos. 5, 6, and 8; and defendants are in no position to complain of defects in the staking, monumenting, or recording of these claims. As to Phil Nos. 5, 6, and 8, the judgment of the trial court is reversed; and the case is remanded to the district court with instructions to grant judgment for the plaintiff and against the defendants, but delimiting the side lines of said claims in accordance with the views hereinbefore expressed.

As to Phil Nos. 3, 4, 7, 9, 10, 11, and 12, the evidence fails to disclose any discovery by plaintiff of a mineral in a vein or lode. Plaintiff was neither in possession nor entitled to possession of these claims at the time the suit was brought and, therefore, may not question the attempts of defendants to establish valid claims on the land at this time. Insofar as the suit relates to Phil Nos. 3, 4, 7, 9, 10, 11, and 12, the judgment is affirmed.

Reversed in part; affirmed in part.