DELBERT A. ERICKSON and E. MARIE ERICK-
SON,

*Plaintiffs and Appellants,*

vs.

TOM HUDSON and ROSA HUDSON,

*Defendants and Respondents.*

DELBERT A. ERICKSON and E. MARIE ERICK-
SON,

*Plaintiffs and Respondents,*

vs.

TOM HUDSON and ROSA HUDSON,

*Defendants and Appellants.*

(Nos. 2554, 2555; October 28th, 1952; 249 Pac. (2d) 523)

318

For the plaintiffs and appellants in case No. 2554 and plaintiffs and respondents in case No. 2555, the causes were submitted upon the brief of Louis Kabell, Jr., of Evanston, Wyoming.

For the defendants and respondents in case No. 2554 and defendants and appellants in case No. 2555, the causes were submitted upon the brief of Clarence W. Cook of Evanston, Wyoming.

## OPINION

BLUME, Chief Justice.

The parties herein were litigants in the case of Hudson v. Erickson, 67 Wyo. 167, 216 P. (2d) 379. They are adjoining owners of lots in the Fairview Addition in the town of Evanston, Wyoming. The case above mentioned involved a strip of land three and a fraction feet in width located between the residences erected on the lots owned respectively by the parties. The foregoing case shows that a fence had been constructed between the two lots although not on the exact dividing line of the properties. It was a small chicken-wire fence, not obstructing the view between the two residences of the parties.

The foregoing case resulted in favor of the Hudsons. The case on appeal was decided on March 21, 1950. It seems that even prior to the final decision of the case in this court, Tom Hudson had decided to erect a board fence on the true dividing line of the lots and he, as early as January 1950, commenced partial construction of the fence, by panels, in his garage located on the east side of his property and situated quite a little distance away from the residence of the Ericksons. Hudson asked advice of counsel as to his right to erect such a fence and was told that he had a right to do so. As to whether or not that advice was obtained in January

1950 or later is not clear. In any event, it was obtained prior to the time that the fence was erected on the dividing line which was on April 30, 1950. The west side of the fence looking toward the Erickson property was painted by a brush with creosote, the easterly side of the fence with white paint. From the front of the Erickson house to the street, the fence consisted partly of boards at the bottom and three white panels of lattice work above it. The separate panels were apparently seven or eight feet in width and 6½ feet in height.

On July 18, 1950, the Ericksons commenced an action against the Hudsons for the purpose of abating the fence as a nuisance and for the recovery of damages. Plaintiffs alleged among other things that the defendants erected the fence as a spite fence, and now maintain it as such, without any advantage to them; that they erected it and have maintained it willfully and maliciously and for the sole purpose of harassing, annoying and injuring plaintiffs in and about the use, occupancy and enjoyment of plaintiffs' property. It was further alleged that by reason of the erection of this spite fence, plaintiffs have been deprived of air, light and view on the southeasterly side and front of their residence, and by reason of fumes and stench of creosote on the fence, the comfort of plaintiffs and their health has been greatly impaired and the value of their premises has been diminished. It was further alleged that the fence was erected to an unnecessary height of 6½ feet and to within 5⅛ inches of the edge of the eaves of plaintiffs' house and within 13 inches of the southeasterly wall, and that the creosote makes the fence unsightly and is obnoxious, offensive, sickening and destructive to the health and comfort of the plaintiffs; that furthermore, the plaintiff, Delbert A. Erickson, became sick as a result of the creosote on the fence; that he suffered serious dermatitis or skin infec-

tion of the face, neck, hands and wrists from the creosote on the fence; that plaintiff was required and compelled to remove from his residence and to expend a large amount of money for physicians and incurred other expenses by reason thereof.

In brief the first cause of action asked for a decree that the fence of defendants is a nuisance and should be abated. The second cause of action is for loss of wages, medical examination and other expenses in the sum of $665.61 and damage in the sum of $3,000 for pain and suffering of Delbert A. Erickson and punitive damages in the sum of $3,000. The third cause of action is a claim for damages in the sum of $500 by reason of suffering and mental anguish of E. Marie Erickson and for damages in the sum of $3,000 for future damage and for $3,000 punitive damages. The fourth cause of action claims damages in the sum of $5,000 for loss of air, light and view and devaluation of plaintiffs' property; damages in the sum of $750 for inconvenience and annoyance to the plaintiff Delbert A. Erickson; damages in the sum of $750 for inconvenience and annoyance to Mrs. Erickson; and for $5,000 punitive damages. The total damages asked by plaintiffs is over $24,000.

Defendants admitted the erection of the fence, denied that it is unsightly or that it is a spite fence or a nuisance. They alleged that the fence was built on advise of counsel; that it serves a useful purpose; that it is erected entirely on the property of the defendant. They denied that it shuts out plaintiffs' light, air and view. They alleged that the reason why they painted the westerly side of the fence with creosote was because they knew that they would never be permitted to go on plaintiffs' premises to paint that side of it; that the fence was constructed in panels in their garage during the winter and that the creosote was dry and

that the odor was entirely gone when the fence was erected. After the trial of the case, the court, on August 27, 1951, rendered judgment in the case as follows:

## "FINDINGS, JUDGMENT AND DECREE

"This cause came on regularly for trial before the Court without the intervention of a jury on the 16th day of April, A.D., 1951, Louis Kabell, Jr., Esq., appearing as counsel for plaintiffs and Clarence W. Cook, Esq., appearing as counsel for defendants, and the Court having heard the testimony and having examined the proofs offered by the respective parties and having considered the briefs submitted, and the Court being fully advised in the premises, doth find:

"1. That the fence in controversy and described in plaintiffs' petition was erected malevolently, solely for the purpose of annoying plaintiffs, without intending to subserve any useful purpose of the defendants, and the same is a nuisance to the extent hereinafter stated, to which defendants duly except.

"2. The Court further finds that the right of defendants to fence their property should be recognized, but such a fence, serving no useful purpose, should be so constructed as not to injure the plaintiffs; and that an order should be entered herein requiring the defendants to reduce the height of the fence described in the pleadings herein, from its present height of six feet six inches to a height not extending above the present lower window sills on that side of plaintiffs' dwelling from the front line of plaintiffs' lot to the rear end and easterly corner of plaintiffs' dwelling house; to all of which defendants duly except; and that the fence as constructed from the rear of plaintiffs' house to the alley may serve some useful purpose and may remain at its present height from said corner to the alley, to which plaintiffs duly except.

"3. The Court further finds that it is a matter of common knowledge that creosote is almost universally used as a wood preservative and there is no evidence to support a finding that defendants knew or should have known that the creosote used on the fence would or was

apt to produce the injuries of which plaintiffs complain; and that there is not that degree of malice, wantonness or willfulness to make defendants responsible for the direct and immediate consequences, if any, of the creosote on the fence regardless of whether it might have been contemplated, foreseen or expected, and plaintiffs are not entitled to damages on their second and third causes of action in their amended petition, to which plaintiffs duly except.

"4. The Court further finds that there is not sufficient evidence to support a finding that plaintiffs suffered damages as alleged in the fourth cause of action of their amended petition, to which plaintiffs duly except. And the Court having made the foregoing findings and conclusions,

"IT IS HEREBY ORDERED, ADJUDGED AND

DECREED that the fence mentioned in plaintiffs' amended petition constitutes and is a nuisance to the extent that the same is higher than the window sills on the southeasterly side of plaintiffs' dwelling house from the front line of the lots of these parties to the rear corner on the southeasterly side of plaintiffs' dwelling house, to all of which defendants except.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendants be and they hereby are ordered to abate the nuisance as above described within thirty days of the entry of this judgment by reducing the height of that portion of said fence from the said back and easterly corner of plaintiffs' house to the front line of the lots of these parties so that the same is not higher than the lowest window sill now on the southeasterly side of plaintiffs' dwelling house; and that if the same be not so abated by the defendants within said thirty days that a warrant to the Sheriff of Uinta County do issue out of this court, under the seal thereof, commanding said Sheriff to abate and remove the said nuisance, as above stated, at the expense of defendants, by cutting and reducing the height of the fence as above stated; and that in case such warrant be issued and executed, the said Sheriff collect the expense of such abatement and removal from the de-

fendants in the manner provided by law; to all of which defendants duly except.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that each of the parties hereto pay their own costs, to which the plaintiffs duly except.

"Done this 27th day of August, A. D., 1951."
Both plaintiffs and defendants have appealed from the foregoing judgment, plaintiffs from that part which denied them any damages, and defendants from that part which ordered a portion of the fence to be reduced in height.

## 1. DAMAGES TO PLAINTIFFS.

The testimony on this subject is voluminous and it would be impracticable and would subserve no good purpose to set it out in detail. We shall mention only some of the highlights. The testimony on the part of the plaintiffs tends to show that the fumes and odor from the creosote was strong and continued until about the 1st of November 1950 and that the plaintiffs were compelled to vacate their premises in the meantime. The testimony on behalf of the defendants shows that the creosote was dry or practically dry when the fence was put up, that if there was any odor from it at all, it disappeared within 24 hours. The trial court resolved the conflict against the plaintiffs and we are bound by its findings. One witness testified that the value of the Erickson property depreciated in value in the sum of $1,000 by the erection of the fence because of its unsightliness and because it shut off the light from the living room and the bedroom. The trial judge viewed the fence personally and evidently came to the conclusion that at least as cut down it would not in any way depreciate the value of the property. In view of that, his finding is of special weight and should not be set aside except for very strong and excellent reason. See our case of Hudson v. Erickson, supra, and cases

ployees of the Union Pacific Railroad; that railroads are constantly handling ties treated with creosote and that he had never heard of anyone being afflicted by creosote vapors. Dr. Holland, a physician at Evanston, testified that he had been a physician for the Union Pacific Railroad and its employees for 38 years; that railroad cross-ties are put in a tank of creosote under pressure and are saturated with creosote; that odor of creosote from wood so treated is much stronger than if merely painted with a brush as was the wood in the case at bar; that he had treated some cases where men came in contact with the saturated timbers and were burned, but he had never had a case where a patient had suffered ill effects from creosote vapors and had never heard of such a case. The witness Patterson testified that he had had a great deal of experience with creosote and had worked with 250 to 300 people working with it; that he knows of no case among the hundreds of people when any one was ever affected adversely by cresote fumes. Other testimony was similar in effect. Counsel for plaintiffs claims that this testimony was incompetent. We think he is in error. He has cited no authority to sustain his contention.

The foregoing testimony goes far in showing that the diagnosis of Dr. Morginson was wrong. In any event, even if it were admitted that Mr. Erickson were allergic to creosote and creosote vapors, the most that could be said is that he was an exception to the rule. In fact Dr. Hellewell thought that Mr. Erickson was "unusually" susceptible to creosote. The governing rule in such case is stated in 66 C.J.S. § 18c, p. 765, 766, as follows:

"In order to determine whether an annoyance is such as to constitute a nuisance, the characteristics of the person claimed to have been annoyed must be considered. The question is the effect which the matters complained of would have on ordinary and reasonable

therein cited. Furthermore, one of the exhibits in the case shows the natural color of the fence on the side of the Ericksons. We are unable to say that it is unsightly.

The main testimony relates to the claim that the creosote was the cause of dermatitis or skin infection of Mr. Erickson and that as a result he incurred large expenses and suffered considerable pain from about April 28, 1950, to about November 1, 1950. Dr. Morginson testified that creosote is a relatively common producer of dermatitis of the skin; that Erickson gave him his case history, according to which his infection got better every time that he was away from his home and got worse every time that he returned to it, and that "if the case history is true, it seems reasonable to conclude that the creosote is responsible for his dermatitis, and since he did not come directly in contact with the fence, it must be the emanation of the creosote vapor in the air that produced his dermatitis."

On the other hand Mrs. Erickson testified that the creosote had no effect on her whatever. Mr. Erickson was employed in a brewery, handling barley, and such handling may cause infection of the skin. Apparently no test was made as to whether or not he was allergic to barley. The brewery shut down about November 1, 1950, and so, according to the theory of counsel for defendants, his recovery may have been due to the fact that he no longer worked in the brewery. Tom Hudson testified that he had erected posts painted with creosote previously in erecting the fences on the other sides of his property, and while the parties herein were on friendly terms, that he had heard no complaint from Mr. Erickson of being affected by that creosote. Furthermore, creosoted light and telegraph poles were erected in the alley adjoining the property of the parties. Dr. Hellewell, witness for the plaintiffs, testified that he is one of the physicians caring for the em-

persons, that is, on persons of ordinary health, normal or average sensibilities, and ordinary tastes and habits and mode of living. The test is not what the effect of the matters complained of would be on persons of delicate or dainty habits of living, or of fanciful or fastidious tastes; or on persons who are delicate, or invalids, afflicted with disease, bodily ills, or abnormal physical conditions; or on persons who are of nervous temperament, or peculiarly sensitive to annoyance or disturbance of the character complained of; or on persons who use their land for purposes which require exceptional freedom from deleterious influences."

It is said in 39 Am. Jur., § 31, p. 311, 312, as follows: "The criterion for determining whether a particular annoyance or inconvenience is sufficient to constitute a nuisance is its effect upon an ordinarily reasonable man—that is, a normal person of ordinary habits and sensibilities—and not its effect upon supersensitive persons, those of too fastidious tastes, those in ill health, afflicted with disease or abnormal physical conditions, or, on the other hand, those who are hardened or inured to annoyances or disturbances of the kind in question."

Counsel for the plaintiffs relies upon the statement also contained in the same section of this work reading as follows: "But injunctive relief will not be denied because the plaintiff appears to be of nervous temperament and more than ordinary sensibilities, where the undisputed testimony is to the effect that his physical condition is due to the nuisance complained of, or where it appears that members of his family not shown to be also nervous likewise suffer annoyance." The case of Krebs v. Herman, 90 Colo. 61, 6 P. (2d) 907, 79 A.L.R. 1054, is cited. We have no fault to find with the decision in that case. It deals with the nuisance created by a dog kennel. It does not deal with the question of damages with which we are at present concerned. Nor is it in point on the question of nuisance in so far as creosote is concerned, for it is admitted, or substantially so, that the fumes, if any, from the

creosote, ceased in any event about November 1, 1950, so that the case does not present a continuing nuisance in so far as creosote is concerned which should be enjoined, as was true in the Colorado case.

It may be that, if the order of the court cutting down the fence is correct, plaintiffs would be entitled to at least nominal damages, and that by reason of the discomforts that plaintiffs might have suffered by reason of the obstruction of the light caused by the height of the fence. But the damage for such discomfort would be hard to estimate. This court has a number of times held that ordinarily a case will not be reversed because plaintiffs would be entitled to nominal damages only. Richardson v. Midwest Refining Co., 39 Wyo. 58, 270 P. 154, Martel v. Hall Oil Co., 36 Wyo. 166, 255 P. 3, Hecht v. Harrison, 5 Wyo. 279, 40 P. 306, Ladd v. Redle, 12 Wyo. 362, 75 P. 691.

We think that on the question of damages, the judgment of the trial court should be affirmed. In fact, we think that that question is of minor importance herein to the plaintiffs, and that their main interest is in the point as to whether or not the judgment of the trial court should be sustained on the appeal of the defendants.

## 2. ON APPEAL OF DEFENDANTS.

We shall accordingly turn to the appeal herein taken by the defendants, complaining of the fact that the court ordered part of the fence to be reduced in height. The two houses of the parties unfortunately are too close together, not exceeding 6 to 7 feet. The fence was built 5 feet from the house of the defendants. It is alleged in the petition of the plaintiffs that the fence was distant from the edge of the eaves of the Erickson house $5\frac{1}{8}$ inches and 13 inches from the wall of the Erickson house. That allegation apparently is denied

in the answer of the defendants. But judging from some of the statements made by counsel for the defendants in his brief and considering the statements made in the case Hudson v. Erickson, supra, it would seem that the allegations in plaintiffs' petition are not far from correct. According to the statement of counsel for defendants, the window sills of the Erickson house are about 30 inches from the ground. Since the fence is 6½ feet in height, the fence above the window sills would be about 48 inches or 4 feet which would quite effectually shut off the light from the eastern windows in the Erickson house. Counsel for defendants say that by cutting the fence down, the view of the plaintiffs would not be improved but that plaintiffs would then merely look at the side of the defandants house instead of the fence. But it is quite apparent that a distance of 13 inches is quite a different thing from a distance of 6 to 7 feet.

It seems clear from the judgment of the trial court in this case that it did not declare the fence to be a nuisance because it was painted with creosote, but that its judgment was based in the main on the fact that the fence obstructed the light on the eastern side of the Erickson house and that the extra height was erected with a malicious intent. Counsel for the defendants base their claim for reversal, in the main, upon the discussion of the court in the case of Anthony Wilkinson Live Stock Co. v. McIlquam, 14 Wyo. 209, 83 P. 364, 368. That case dealt with a fence round a section of land surrounded by public domain. The court speaking through Chief Justice Potter stated in part as follows: "To authorize the interference of equity, therefore, to restrain such fencing, it must appear that it invades some legal or equitable right of the plaintiff. Like every other landowner, the defendant has absolute dominion over its own lands, and it may make any legitimate use of them it sees fit, and, should injury to

adjoining landowners thereby result, it will be damnum absque injuria. * * * And the rule is general that, in determining whether the use of one's property is or is not a nuisance, the motive of the party has no connection with the injury or bearing upon the result. Wood on Nuisances (2d Ed.) § 6. It is immaterial, therefore, what the purpose of the defendant was in the erection of its fences, if it was not unlawful to erect them, and their erection did not invade or interfere with some right of the plaintiff."

Counsel for the plaintiffs say that the case involved only a question of a public nuisance instead of a private nuisance. We do not think that it is necessary to examine the case too closely. The language used must be construed in view of the facts in the case. It has been said: "Whether a thing is a nuisance or not is a question to be determined not merely by an abstract consideration of the thing itself, but in reference to circumstances. What would be a nuisance in Belgrave square would not necessarily be so in Bermondsey; * * *" Sturges v. Bridgman, L.R. 11 Ch. Div. 852, 48 L.J. Ch. 785, 11 C.H.D. 852, 41 L.T. 219, 28 Week Rep. 200. The language used by Chief Justice Potter in the foregoing case and many other cases applies when proper beneficial use is made of a structure on one's own land. But to apply it universally to all cases is another matter. We have a time-honored maxim reading summum jus saepe summa injuria. Translated that means that a rule of law carried to its extreme conclusion is often extreme injustice.

What the law is or was under the common law is not easily determined. The principle involving malicious action which inflicts damages upon another has been in the process of development and elucidation in the main only during the last century and particularly in about the last sixty years. In 1853 in the case of Stevenson

v. Newnham, 13 C.B. 285, 138 English Reprint 1208, 1211, it was said. "It is well established in point of law, that the insertion of the word 'maliciously' in a declaration, where the act complained of is not unlawful per se, will not make good a count which would be bad without it." In the case of Allen v. Flood, Appeal Cases 1898, p. 1, it was said by Lord Watson (page 92): "Although the rule may be otherwise with regard to crimes, the law of England does not, according to my apprehension, take into account motive as constituting an element of civil wrong." And in the same case (page 172), Lord Davey said: "But I do say that I am not aware of any authority binding on this House for holding, and it humbly appears to me to be against sound principle to hold, that the additional ingredient of malicious motive should give a right of action against an individual for an act which if done without malice would not be wrongful, although it results in damage to a third person." Pollock, noted author on Torts, did not agree with these opinions. 22 Law Quarterly Review, p. 118. Nor did the author of an article in 22 Harvard Law Review 501-519. They agreed with the opposite statement made in the case of The Mogul Steamship Company v. McGregor, Gow & Co., 23 Q.B.D. (1889), p. 598, 613, by Bowen, L. J., to this effect: "Now, intentionally to do that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that other person's property or trade, is actionable if done without just cause or excuse. Such intentional action when done without just cause or excuse is what the law calls a malicious wrong." And Justice Holmes in the case of Aikens v. Wisconsin (1904), 195 U. S. 194, 25 S. Ct. 3, said among other things: "It has been considered that, prima facie, the intentional infliction of temporal damages is a cause of action, which, as a matter of substantive law, whatever may be the form of pleading,

requires a justification if the defendant is to escape."
J. B. Ames, one of the noted jurists and teachers during the first part of this century, reviewed the subject at some length in 18 Harvard Law Review, 411-422, and divides the cases on the subject in three groups. Those falling under the first group are cases in which the actor is privileged on the grounds of public policy even though he acts with malicious intent to inflict damage upon the other. As to the second group, he states as follows:

"There is much divergence of judicial opinion as to the liability of the owner of land for using it, not for any benefit to himself, but purely to the detriment of his neighbor. The typical illustrations of such conduct are the sinking of a well by the owner, not in order to get water for himself, but solely for the purpose of draining his neighbor's spring, or the erection by the owner on his land, but near the boundary, of an abnormally high fence, not for any advantage of his own, but merely to darken his neighbor's windows or to obstruct the view. In England it seems to be settled that the owner may act in this malevolent manner with impunity. In France and Germany the owner is liable in tort in each case. In this country there is a strange inconsistency in the reported decisions. In thirteen of the fifteen jurisdictions in which the question has arisen the courts have declared that the malevolent draining of a neighbor's spring is a tort. On the other hand in six of the ten states in which actions have been brought for the malevolent erection of a spite fence, the opinion of the court was against the plaintiff.

"That the conduct of the defendants in these cases is unconscionable no one will deny. That they should be forced to make reparation to their victims, unless paramount reasons of public policy forbid, would seem equally clear. But the absence of such reasons is evident from the fact that in France and Germany and so many of our states the courts have allowed reparation, and from the further fact that in at least six states statutes have been passed making the erection of spite fences a tort. Such legislation is likely to spread, so

that ultimately the cases in this second group will belong in the third group."

We touched upon the subject before us to some extent in the case of State v. Langley, 53 Wyo. 332, 353, 84 P. (2d) 767, a case completely overlooked by counsel, and which foreshadowed the decision in the present case. We stated in that case that a man may go into business in order to make a living, though he does so with intent to injure another in a like business. In such case a proper purpose is subserved—to make a living. But we stated further, citing several cases, that it is another matter, if he does so purely with malicious intent to injure another. We further called attention to the fact that in 1904, the author of an annotation on the "effect of bad motive to make actionable which would otherwise not be," covering over fifty pages, came to the conclusion that the weight of authority at that time was as follows:

"(1) 'If one does an act which he has a perfect right to do, to accomplish some real benefit or pleasure to himself, or others in whom he has a genuine interest, and for doing which in good faith no action would lie, he is not rendered liable to an action therefor by the fact that he did it from bad motive and with intent to injure another, and such injury results.

"(2) 'But if one, with the sole and malicious purpose of injuring another, and without any benefit, interest, or pleasure (other than that which he derives from his wicked intent) to himself of others, commit an act which, if done in good faith, would be justifiable, he is liable in an action in favor of such other person for the damage he may have sustained therefrom.' "

An annotation on the direct subject before us is contained in 133 A.L.R. 691, 692, and subsequent pages. The author of that note summarizes his conclusions as follows: "Indeed, regardless of the fact that prior to the decision in the Burke Case (Burke v. Smith, 69 Mich. 380, 37 N.W. 838, 8 L.R.A. 184) it was undoubt-

edly the majority rule, and perhaps an almost universal rule, that the motive with which a structure was erected could not be inquired into, though it injured an adjoining landowner, it seems that there is now about an even division of authority on this question, and, if jurisdictions in which there are mere dicta on this question are disregarded, it might be said that a majority of the courts which have passed upon the question are now of opinion that spite structures serving no useful purpose constitute private nuisances where they injure the owner or occupant of adjoining premises." See also 22 Am. Jur. 546, 547, § 43.

The trial court in reaching its conclusions adopted what was considered the weight of authority in the foregoing quotation, and apparently relied largely upon a Nebraska and Oklahoma case. The Nebraska case is that of Bush v. Mockett, 95 Nebr. 552, 145 N.W. 1001, 52 L.R.A. 736, 737, 738, in which the court said in part:

"The common law of England strenuously adhered to the doctrine that the owner of real estate might use it as he pleased, without regard to the convenience or even the interests of his neighbors. Some exceptions were made as to 'ancient lights' and perhaps other such considerations. This rule of the common law was not quite in harmony with the theory of the civil law as expressed in the maxim, *Sic utere tuo ut alienum nom laedas.* The earlier decisions in this country are inclined to the English view; but in recent years there have been some very notable departures from the strict rule of those courts. * * * No doubt everyone has the right to any beneficial use he may see fit to make of his own property, if the benefit he seeks is not out of all reasonable proportion to the injury caused to another. His neighbors have no legal cause to complain, although it may interfere with some privileges formerly enjoyed. Courts of equity would fail in the service that history shows they were intended to render to society if they are unable to protect those common rights which more clearly appear, and become more valuable,

as civilization advances, and the relations of social life become more intricate and more enjoyable. As was said by Mr. Justice Hoke in his dissenting opinion in Barger v. Barringer, supra, we cannot 'allow causes of action to be based upon motive alone. For here we enter upon the domain of taste and temperament, involving questions entirely too complex, varied, and at times fanciful for satisfactory inquiry and determination by municipal courts.' But when it appears that not only was the motive wholly malicious, but the intention and result were to seriously injure another, without benefit to anyone, courts of equity are not so impotent in these modern times that they are unable to prevent such a wrong."

The Oklahoma case is that of Hibbard v. Halliday, 58 Okla. 244, 158 P. 1158, L.R.A. 1916 F. 903, 905, in which the court said among other things as follows:

"We may concede at the outset that at common law no actionable wrong can arise, unless there has been some invasion of another's right; and that the owner of land has a right to make any reasonable use of his property without liability for any loss there may flow to his neighbor from such use; and that a lawful act cannot be actionable, though it proceeded from a malicious motive. A critical examination, however, of some of the many cases cited by counsel in support of their various contentions convinces us that whatever conflict there appears to be in the authorities on the question now before us is due more to the difficulty of applying the very general rules to specific statements of facts than to any misunderstanding as to the rules themselves. We can nowhere find it stated broadly as a principle of the common law that a landowner's property right in real estate includes the right to use it malevolently solely for the injury and annoyance of his neighbor, without intending to subserve any useful purpose of his own. Therefore, when we concede that the owner of land has a right to make any reasonable use of his property, and when employed for such use may rightfully injure another, it does not follow that by its use for a wholly wrongful purpose he may also rightfully injure another. * * * It is true that no one has an exclusive property in air or light except as the same

may exist or be confined on his own premises, but under a correct application of the principles above enunciated we do not think it can be said that the common law permitted a man to be deprived of light or air for the mere gratification of malice. At common law there was a cause of action whenever one person did damage to another wilfully and intentionally, and without just cause or excuse."

It is claimed that there is no evidence in the case to support the judgment of the trial court in holding that the fence was erected malevolently, or that it subserved no beneficial purpose. Tom Hudson testified that he erected it for the purpose of privacy and to keep peace between the parties and that he did so in view of previous quarrels between the parties. The fence was not erected until after the parties had litigated the dividing line between their properties. In the case of Kirkwood v. Finegan, 95 Mich. 543, 55 N.W. 457, 458, the court stated: "This is a bill to enjoin the erection and maintenance of a fence between premises occupied by the parties. We think the case is ruled by Flaherty v. Moran, 81 Mich. 52, 45 N.W. Rep. 381. It is clear that the fence is the outcome of a quarrel between neighbors. Its character and style indicate the motive which prompted its construction, and the decree below must be affirmed, with costs. The other justices concurred." That is substantially the situation in this case. In the case of Flaherty v. Moran, just referred to, the defendant in the case had erected a fence which shut off the light and air from a neighbor. He testified that he did so to keep the neighbor from looking through his house and to protect his lawn. But the court paid no attention to that testimony and compelled the removal of the fence.

That the defendants sought privacy and peace may be true, but the beneficial purpose of the fence in that connection, if any, at least as to the height of it, is far out of proportion to the injury inflicted. Common

sense dictates that it would be offensive to any neighbor whatever. The cause and underlying reason for the erection was the ill-feeling toward the plaintiffs, and that the trial court held that the fence was erected malevolently to the extent indicated by the judgment herein, is understandable. The court in issuing an injunction did not go beyond the requirements of the case, and followed the rule stated in 39 Am. Jur. 443, § 172. It viewed the premises and was better able to judge the extent to which the fence should be reduced in height than we are. The judgment herein should be affirmed, and it is so ordered.

*Affirmed.*

RINER, J., and ILSLEY, J., concur.