John L. MASEK, Appellant (Defendant
below),

v.

John C. OSTLUND and Axel R. Ostlund,
Appellees (Plaintiffs below).

No. 2936.

Supreme Court of Wyoming.

Dec. 30, 1960.

Carroll & Cole, Bernard E. Cole, Chey-
enne, for appellant.

John P. Ilsley, Gillette, for appellees.

Before BLUME, C. J., and PARKER and
HARNSBERGER, JJ.

Mr. Justice PARKER delivered the opin-
ion of the court.

This is an action by John C. Ostlund and
Axel R. Ostlund, plaintiffs, against John L.
Masek, defendant, seeking an accounting of
the proceeds of mineral ore taken from a
mining claim belonging to plaintiffs known
as Sue 3 and asking for exemplary damages.
The petition alleged that plaintiffs on Jan-
uary 1, 1955, filed a notice of location of
unpatented lode mining claim known as

Sue 3 in sec. 17, T. 44 N., R. 75 W., sixth principal meridian, Campbell County, Wyoming; that defendant on January 10, 1955, filed a notice of location on the same land; that the dispute as to ownership of the mining claim resulted in a suit to quiet title in the District Court of Campbell County wherein it was adjudged that the title to the mining claim Sue 3 was in plaintiffs; that in 1955 and 1956 defendant in reckless disregard of plaintiffs' rights trespassed upon and extracted minerals from plaintiffs' property, shipping ore therefrom in an amount exceeding $5,000.

Upon the trial of the cause before the court acting without a jury, judgment was given for plaintiffs in the sum of $5,231.99, the same being the proceeds of the mineral ore sold by defendant as shown in Plaintiffs' Exhibit 1, the settlement sheets from the purchaser. Defendant has appealed, urging that there was a failure of proof and that there is no substantial evidence upon which the judgment can be based. He insists that the mineral ore which he admitted having mined and sold came from his Campbell 1 and not from plaintiffs' Sue 3. Thus, the question before the trial court was the position of the mining operations as it related to the two claims, and we review the record to determine the propriety of the findings of the court.

■ There was admitted in evidence the pleadings and judgment of a previous suit in the same court wherein the Ostlunds as plaintiffs sought to quiet title to Sue 3 against defendant Masek. In that action the petition did not give the description of the claim but merely said that it was located in sec. 17, T. 44 N., R. 75 W., sixth principal meridian, Wyoming. The petition, by court order, was later made more definite and certain by a certified photostatic copy of the location notice of Sue 3 being at-

tached to the petition.[1] The judgment recited a trial on the merits and decreed title to Sue 3 (described only by section, township, and range) to be in the Ostlunds. Although the judgment did not give a description of the claim, it seems to be a generally accepted practice that such a judgment may be aided by the pleadings. Moore v. Unknown Heirs of Gilchrist, Tex.Civ. App., 273 S.W. 308; 1 Freeman, Judgments, 5th ed., p. 165. Apparently, there was a record of the testimony in the quiet title action since there is occasional reference to questions there asked, but it was not offered in the present case, and seemingly this court is expected to accept the judgment in the quiet title action without any knowledge of its details.

At the trial of the instant case, John C. Ostlund, one of the plaintiffs, telling of what he and his brother had done, said:

"We placed the—Our discovery was in the same general location that three previous discoveries had been. It isn't a coincidence necessarily, but our stakes coincided with them. There was a discovery notice there—ah—sometime in 1952. And there was a discovery notice there sometime in 1954. And there was an additional discovery notice there from Dr. Masek dated around September 27th or 29th of 1954. And that is what our discovery notice was, that is the discovery on that claim for the uranium in place. We used our east boundary of the claim—ah—was the 'B' Claims and from that general discovery what was made—ah—our stakes naturally coincided with the previous stakes that had been there. Campb No. 1 stakes were—at that time—were there and in place. The reason we went ahead and staked it was because we thought the claim had been abandoned

---

1. The description given in the attachment was: "Beginning at a point which is the SE corner of Sec. 17, T.44, N.R., 75, W. 6th P.M., Wyoming. thence 650 feet in direction West; thence 140 feet in direction North; * * * thence 600 feet in direction North 120° West; * * * thence 1500 feet in direction North 30° West; * * * thence 600 feet in direction North 60° East; * * * thence 1500 feet in direction North 150° East * * *."

as it had been done by the two previous locators.

\*    \*    \*    \*    \*    \*

" \* \* \* My brother and I surveyed the claims to this extent, by use of a transit and a stadia rod we took a known point—which was the section corner—the southeast section corner of that particular section, 17. At the time we were on the grounds a chain was not available so we borrowed a stadia rod and transit. And we determined the distance from the section corner—ah—due west. And then in turn we determined the distance—ah—north to locate the southeast corner of that claim."

He said the southeast corner of the Sue 3 claim was 650 feet west and 140 feet north of the southeast corner of section 17 and that "the balance of the description was done mathematically with the use of trigonometry." He further stated that it was cold and windy on the day they conducted their survey and admitted that the instruments used were not as accurate in such weather as they would commonly be. He also conceded that neither he nor his brother were qualified surveyors although he stated that each had some education and experience in the field. He said they later found their discovery pit filled in and their stakes removed but made no attempt to replace the stakes.

Dale Ruby, a rancher in the area who had staked the B Claims, was asked:

"Did you see any stakes belonging to Campb No. 1 with regard to the east side of Campb No. 1, Sue No. 3, and the west side of the 'B' Claims 1, 2, 4, and 5?"

He answered:

"Yes, they was the common boundary."

Questioned as to where the mining took place, he said, "I'd say approximately 350 feet west of the east boundary. West boundary of the 'B' Claims."

Defendant testified that he staked his Campbell 1 on November 9, 1954, but did not file his location notice until January 10, 1955. In May 1955 he arranged with Zwill, a licensed surveyor, to survey the claim, accompanying him to the premises and advising him where the stakes were. Masek filed an amended location notice on May 26, 1955, based on Zwill's map of the premises, a copy of which was introduced in evidence without objection. His amended notice showed substantially the same position as the previous one, but the directions shown thereon were specific; both notices listed the southeast corner of the claim to be some 1,096 feet west of the southeast corner of section 17, supra. He admitted that some time after January 1, 1955, he went upon Campbell 1, found a pit dug and fenced about fifty feet east of his pit which he had dug on November 9, 1954, and filled it in. He also admitted mining and shipping the ore listed on the settlement sheets which were introduced in evidence.

Morris L. Carter, a licensed surveyor, testified that on August 4, 1957, he "resurveyed" Sue 3 in accordance with plaintiffs' notice of location, found no Sue stakes, but discovered three corner and two side stakes of Campbell 1. According to his testimony and the map prepared by him, which was introduced as an exhibit, the southeast corner of Campbell 1 shown by the stakes he found was 1096.3 feet north, 76 degrees, no minutes, west of the southeast corner of section 17, supra, or approximately 432 feet westerly of the corresponding corner of Sue 3 as shown on plaintiffs' notice of location and as surveyed by him.

During the process of the trial, the court at the suggestion of counsel made a trip to the premises for personal observation.

An analysis of the above evidence discloses several matters over which there is no controversy:

(1) Plaintiffs assert title only to that property which was described in their notice of location and embodied in their petition in the suit to quiet title.

(2) Insofar as the staking was concerned, the Campbell 1 and Sue 3 claims

were completely overlapping, the stakes of each being along side those of the other.

(3) The east common boundary of Sue 3 and Campbell 1, as they were staked, constituted the west boundary of B Claims 1, 2, 4, and 5, the accurate position of which was not disclosed.

(4) Defendant took mineral ore in the amount of $4,208.20.[2]

Taking all of the testimony at face value with the possible implications, there is a direct conflict as to the position of the east common boundary of the disputed claims, plaintiffs testifying that the southeast corner of Sue 3 commenced 650 feet west and 140 feet north of the southeast corner of section 17, supra, and the testimony of Carter as well as his map and the map of Zwill indicating that the southeast corner of Campbell 1 was 1096.3 feet northwesterly of the southeast corner of section 17, supra. Since plaintiffs testified that they placed their stakes so as to coincide with those of defendant, it follows that one or the other of the location notices of the parties was in error, that is, did not state a correct description of the claim as staked. Thus, unless the trial court considered that plaintiffs were entitled to Sue 3 as it was staked and regardless of the description listed in the location notice (an argument which appears nowhere in the record), there was only one basic determination to be made, Who erred in the location notices?

There are two factors which would seem to have a bearing upon this: Defendant's notice of location dated November 9, 1954, filed of record January 10, 1955, showed the same description as his amended location notice filed May 26, 1955, and was substantially the same as the surveys made by Carter and Zwill, each based upon the actual position of the Campbell 1 stakes. The location notice of plaintiffs was apparently based upon the computations which the two had made after their discovery and a determination that they would stake Sue 3 exactly over Campbell 1. They were not qualified surveyors. Moreover, it was admitted that the instruments were not as accurate when used in cold and windy weather as they would commonly be.

Undoubtedly the actual position of the staking of the disputed claims could have been established more definitely in several ways, e. g., by showing what part of the west lines of the B claims formed the east line of the boundary of the disputed area and informing the court precisely where such line was.

In evaluating this cause from the record before us, we wish, as we frequently do, that the trial court might have made findings of fact and conclusions of law which would inform us of the truths which the evidence disclosed to that court and of the rules by which the court interpreted them. We would also have been better satisfied had the judgment in the quiet title action been made meaningful by a presentation of the record which served as its basis. However, we must proceed as best we may without such information.

In consideration of the record we must bear in mind that autoptic inspection supplies evidence[3] and that a trial court's findings after inspection of the questioned premises are entitled to special weight.[4] Also, as plaintiffs point out, an appellate court must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it.[5] In construing this rule, we have

2. This figure omits the costs of transportation which were included in the $5,231.99 awarded by the judgment.

3. Casper Lodge No. 22, I.O.O.F. v. Corbridge, 74 Wyo. 244, 286 P.2d 1047.

4. Erickson v. Hudson, 70 Wyo. 317, 249 P.2d 523.

5. Jacoby v. Town of City of Gillette, 62 Wyo. 487, 174 P.2d 505, 177 P.2d 204, 169 A.L.R. 502; Willis v. Willis, 48 Wyo. 403, 49 P.2d 670; Id. 49 Wyo. 296, 54 P.2d 814.

previously noted that it has limitations, and does not relieve an appellate court of its duty of analyzing the evidence in the light of reason and human experience, giving consideration to the motives and propensities which tend to influence or prompt human action, in an effort to solve the question of whether the judgment is reasonably and substantially sustained by the evidence.[6]

All of the evidence adduced in the trial of this cause, analyzed in the light of the applicable law, shows the conflicting claims to have been staked one on top of the other, but the notices of the two locations described different property. The actual position of the coincident two boundaries of the two claims as staked was shown only alternatively, one possibility being a northwesterly line beginning at a point 650 feet west and 140 feet north of section 17, supra, and the other a similarly directed line beginning at a point 1063.74 feet west and 265.217 feet north of the southeast corner of section 17, supra.

If the plaintiffs' testimony is to be believed literally, then the former is true; but if the testimony of the surveyor is correct, then the latter is true. A fair interpretation of the evidence in the light of the rule stated in the Arbogast case would not permit the acceptance of plaintiffs' testimony over that of a professional surveyor whose map was unchallenged and was supported by a second surveyor's map admitted without objection. This is especially true when as previously mentioned the exact position of the line was susceptible of proof beyond question. Accordingly, we are obliged to hold that the judgment is unsupported by the evidence and the case must be reversed.

We are, of course, authorized to order the entry of a final judgment for defendant, but this is a situation which by reason of nondisclosure of certain facts would thus produce a result founded on speculation rather than justice. It is well established that an appellate court has discretionary power to remand a cause for a new trial so as to prevent a failure of justice.[7] It is, therefore, ordered that the cause be remanded with directions that a new trial be granted in order that there may be a full disclosure of all facts relevant to its fair adjudication.

Reversed and remanded.

BLUME, C. J., concurs.

Mr. Justice HARNSBERGER.

The judgment of the lower court should be affirmed. The crucial determinative factors are:

(1) The actual ground markings, rather than the recorded description, fix the boundaries of a lode claim.

(2) The markings of Sue 3 were ascertained notwithstanding the marking stakes had been removed without fault of plaintiffs.

(3) Substantial evidence indicated appellant had actual notice the location of Sue 3 was identical with the former location of Campbell 1, the ground markings of which remained.

Preponderant authority, both text and case, agrees that where there is conflict between markings on the ground and description in the recorded location notice, the markings control, if they can be definitely located *or their location can be clearly ascertained.*

For text authorities see 58 C.J.S. Mines and Minerals § 52, pp. 106, 107; 36 Am. Jur., Mines and Minerals, § 89, pp. 341, 342; 1 Snyder on Mines, 1902, § 392, p. 360;

6. Steadman v. Topham, Wyo., 338 P.2d 820; Montgomery Ward & Co. v. Arbogast, 53 Wyo. 275, 81 P.2d 885.

7. Security-First Nat. Bank of Los Angeles v. King, 46 Wyo. 59, 23 P.2d 851, 90 A.L.R. 125; Brown v. Maryland Casualty Company, 111 Vt. 30, 11 A.2d 222, 129 A.L.R. 1404. And see Loos v. Mountain Fuel Supply Co., 99 Utah 496, 108 P.2d 254; Commercial Standard Ins. Co. v. Remay, 58 Idaho 302, 72 P.2d 859, 120 A.L.R. 1; Bergeron v. Travelers Insurance Company, La.App., 113 So.2d 302; 3 Am.Jur. (1936) Appeal and Error § 1210; 5B C.J.S. (1958) Appeal and Error § 1933.

Morrison's Mining Rights, 16th ed., Variance, p. 89; Ricketts, American Mining Law, Cal.Dept. Nat.Res., Div. of Mines, Bull. 98, 1931, n. 11, p. 396 and n. 21, p. 397; Martin's Mining Law and Land-Office Procedure, 1908, § 151, pp. 117, 118; Martz, Cases and Materials on the Law of Natural Resources, 1951, pp. 559–61.

Attention is also called to 1 Rocky Mountain Mineral Law Institute, First Annual, 1955, pp. 308, 309, where it is said:

"* * * The inherent weakness of a locator's title is that there is no written instrument which is in fact evidence of title. True, he has a recorded location certificate, but in the last analysis, all that any recorded certificate conclusively proves is that it was recorded. Unlike the holder of a federal oil and gas lease, the validity of his title depends upon proof of things *not of record.* * * *" (Emphasis supplied.)

See also 2 Lindley on Mines, 3d ed., § 381, pp. 899–903, and § 382, pp. 904, 905, wherein it is said:

"Mr. Washburn states the general rule to be, that courses and distances are generally regarded as more or less uncertain, and always give place, in questions of doubt or discrepancy, to monuments and boundaries that are referred to as indicating and identifying the land.

"This doctrine has been uniformly applied by the courts to certificates of location of mining claims, and is the rule prescribed by congressional law for construing mineral patents. * *"

Another recognized authority says:

"But, ordinarily, surveys are so loosely made, instruments so liable to be out of order, and admeasurements, especially in rough or uneven land or forests, so liable to be inaccurate, that the courses and distances given in a deed are regarded as more or less uncertain, and always give place, in questions of doubt or discrepancy, to known monuments and boundaries that are referred to in the deed as indicating and identifying the land. * * *" 3 Washburn on Real Property, 6th ed., § 2324, p. 387.

In addition to these text authorities, the following excerpts are from a few of the numberless cases which hold that where there is conflict between descriptions in recorded location notices and markings made upon the ground the latter control:

"* * * But the fact remains that the work of posting the stakes was actually done. The testimony of defendant's witnesses upon this point is clear, positive, direct, and undisputed. * * * The only conclusion that is justified by the evidence is that the stakes and monuments were actually placed upon the corners of each of the locations made on January 2, 1888, and the conclusion is equally inevitable that the locations were so marked that the boundaries thereof could be readily traced. All the authorities agree that any marking on the ground, by stakes, monuments, mounds, and written notices, whereby the boundaries of the location can be readily traced, is sufficient. * * *" Book v. Justice Min. Co., C.C.1893, 58 F. 106, 112, 113.

"* * * Then, again, locations are often made without any accurate knowledge of the true course and directions which a compass would readily give, and mistakes in the notice as to the direction and course of the ground located often occur. *But such mistakes do not invalidate the location.* Positive exactness in such matters should never be required. *It is the marking of the location by posts and monuments that determines the particular ground located.* * * * Such stakes and monuments would control the courses specified in the notice. * * * The mistakes made in the notices as to the courses of the lines are not, in the light of the other facts, sufficient to invalidate the locations. * * *" (Emphasis supplied.) Book v. Justice Min. Co., C.C.1893, 58 F. 106, 115, 116.

" * * * If the calls as to distances and courses set out in the description vary from the markings actually made on the ground, the latter are to prevail, as it is the markings on the ground which establish the boundaries of the claim in contemplation of the statute. * * * if you are satisfied from the evidence that the distances and courses set out in the description, as shown by the record, do not correspond with the markings made on the ground, then the latter must prevail, and will determine the locus in quo of the location, *regardless of any description appearing from the record*. The controlling act in making the location *is the marking on the ground so that the boundaries of the location can be readily traced*." (Emphasis supplied.) Meydenbauer v. Stevens, D.C.Alaska, 78 F. 787, 792.

" * * * The well-settled rule in that respect is that, where the monuments are found upon the ground, or their position or location can be determined with certainty, the monuments govern, rather than the location certificate; * * *." Treadwell **v.** Marrs, 9 Ariz. 333, 83 P. 350, 355.

"That the courses and distances of a survey must yield to its monuments, whether natural or artificial, is a familiar doctrine. 3 Wash.R.P. *621, and cases there cited.

"Negligence in making surveys; imperfect instruments; variations of the needle; roughness and unevenness of the ground—are some of the elements of uncertainty affecting courses and distances, and make obvious the propriety of the rule. *Ibid.*" Pollard v. Shively, 5 Colo. 309, 313.

"It was said in Treadwell v. Marrs, 9 Ariz. 333, 83 P. 350, 355, on an issue as to the location of a mining claim, 'that, where the monuments are found upon the ground, or their position or location can be determined with certainty, the monuments govern, rather than the location certificate; but where the course and distances are not with certainty defined by monuments or stakes, the calls in the location notice must govern and control.' This is a salutary and well settled rule calculated to require the best evidence of the true boundaries of a claim, and to prevent the swinging or floating of claims to the detriment of subsequent locators. Of course inaccuracies or mistakes in a mining location will not invalidate the location, and in such cases *monuments originally erected on the ground control the courses and distances.* * * *"** (Emphasis supplied.) Gray v. Coykendall, 53 Nev. 466, 6 P.2d 442, 444, 445.

" * * * Take the respondent's position in its extreme results, and it would appear that, if the description upon the face of a notice is good, then it is still good, even if it be made to appear by the clearest evidence that it describes nothing. Take an apparently good description, go upon the ground with it, find the monuments mentioned, then start to run the lines of the claim by reference to the monuments, and find that the monuments so exist, and the lines are so located by reference to them, that the description is wholly unintelligible, and, with the description, one cannot find the premises intended to be described. Then we must accept that location description as final, and cannot show by any testimony that it is utterly worthless for the purposes of identifying the claim. *We do not understand that to be the law.*

" * * * Then it is certainly a matter of legitimate proof whether, in fact, there is any reference to the permanent monument which is intelligible, or whether the reference is delusive, meaning nothing, describing nothing, and misleading. * * *"** (Emphasis supplied.) Dillon v. Bayliss, 11 Mont. 171, 27 P. 725, 728.

"The rule is well settled that stakes and monuments upon the ground will prevail over the calls of a location notice in case of discrepancy. Sturtevant v. Vogel (C.C.A.9th 1909) 167 Fed. 448, 93 C.C.A. 84; McElvoy v. Hyman (Hallett C.C.1885) 25 Fed. 596, 599; Book v. Justice Mining Co. (Hawley C.C.1893) 58 Fed. 106, 115; Meydenbauer v. Stevens (Delaney D.C.1897) 78 Fed. 787; Smith v. Newell (Marshall C.C.1898) 86 Fed. 56, 58; Meyer, C. R. M. Co. v. Steinfield (1905) 9 Ariz. 245, 80 Pac. 400; Upton v. Santa Rita (1907) 14 N.M. 96, 89 Pac. 275; Pollard v. Shively (1880) 5 Colo. 309; Cullacott v. Cash G. M. Co. (1885) 8 Colo. 179, 6 Pac. 211.

\*   \*   \*   \*   \*   \*

" \* \* \* This view seems to be in harmony with certain expressions in Sturtevant v. Vogel (C.C.A.9th) 167 Fed. 448, 453, 93 C.C.A. 84, 89, where it was said:

" 'There is no evidence in the case to indicate, and it is not claimed by the plaintiff in error, that he was misled by the defects in the recorded notice of location, or that he ever saw or heard of the location notice. Indeed, he testified that he never saw it. In view of that fact, the case as it went to the jury stood precisely as it would have stood, if no notice whatever of the location had been recorded.' " Cardoner v. Stanley Consol. Min. & Mill Co., C. C.1911, 193 F. 517, 519, 520.

"Plaintiff concedes that the location notice does not describe the Good Luck Mine in accordance with the monuments which at the time of the location were erected on the ground. She contends, however, that such monuments control over the description and courses as contained in the location notice. \* \* \*

\*   \*   \*   \*   \*   \*

"Notices of location are to be liberally construed. \* \* \* At 40 Corpus Juris, p. 805, it is said in referring to the sufficiency of the location notice: 'If it is made in good faith, it should receive a liberal and reasonable construction in favor of the locator; and if by such construction the language employed in describing the claim, when taken in connection with the markings on the ground and other surrounding circumstances, will enable a reasonably intelligent person to find the claim, and trace its boundaries, and therefore imparts notice thereof to subsequent locators, it is sufficient.' " McLean v. Ladewig, 2 Cal.App.2d 21, 37 P.2d 502, 504.

"However, in each of several respects appellants contend that the evidence failed to show that the several locations assertedly made by the defendants Smith were made in accordance with the provisions of the statutes in that regard. Sec. 1426 et seq., Civ. Code. The principal objections made in that connection by appellants, in effect are: that some of the location notices filed by defendants Smith were defective for the asserted reason that they failed to properly describe the respective claims in that some of the said notices specified a description different from that indicated by the boundaries as erected on the claims by the defendants Smith; \* \* \*. \* \* \* nevertheless, it may be said, generally, that it has been ruled, in effect, that notices of location should be liberally construed, and that 'monuments erected in the field should control courses and distances as indicated upon paper', which statement it was held 'embodies a correct rule many times declared by this court'. Schroder v. Aden Gold Mining Co., 144 Cal. 628, 629, 78 P. 20. As was said in the case of McInerny v. Allebrand, 107 Cal.App. 457, 461, 290 P. 530, 531, ' \* \* \* the recitals in the location notice cannot be accepted as proof of the various steps essential to perfect a mining claim. \* \* \* "And, besides, if it [the location notice] had contained every essential

requisite of a location notice, the copy of the record would have proved nothing except the bare fact that such a notice had been recorded. It would not have proved that * * * the location was so marked on the ground that its boundaries could be readily traced, * * *" ', * * *

"Furthermore, the question whether the location of a mining claim as designated by boundaries marked on the ground is clearly ascertainable, is properly a ·question of fact for the trial court. * * * And where, as in the instant case, the evidence relating thereto is conflicting, so, also for the determination of the trial court is the question with respect to the accuracy and sufficiency of the 'natural object' * * *." Denman v. Smith, 14 Cal. 2d 752, 97 P.2d 451, 453, 454.

The evidence admittedly establishes that appellees sufficiently marked the boundaries of Sue 3 upon the ground and placed their discovery and marking stakes within six inches to two feet from each of the stakes marking the boundaries of the abandoned Campbell 1 location. Thus the exact location of the boundaries of Sue 3, as located by appellees, was definitely ascertained even though their own marking stakes of Sue 3 were removed. While there was no direct evidence that appellant was responsible for the removal of the Sue 3 stakes, the apparent interest and purpose the appellant had to defeat the claim of appellees was a circumstance the court was entitled to take into consideration if it chose to do so. Consequently, if a finding that the appellant was responsible for the removal of the Sue 3 stakes is necessary to support the court's judgment, we must consider the court so concluded. In any event, when it was once established that Sue 3 had been located by placing marking stakes at points practically identical with the Campbell 1 stakes which still remained in place, the rights of the appellees were fixed and vested, and these rights could not be defeated by the subsequent removal of these stakes without

appellees' fault, even though appellant was not responsible for their removal. The law in this respect is also very clear. 58 C.J.S. Mines and Minerals § 47, p. 101; 36 Am. Jur., Mines and Minerals, § 94, p. 346; 2 Lindley on Mines, 3d ed., § 375, pp. 889, 890.

"* * * But there must be some such marking, and when a mining-claim is once sufficiently marked out upon the ground, and all other necessary acts of location are performed, it vests the right of possession in the locator, *which right cannot be divested by the obliteration of the marks or removal of the stakes* without the fault of the locator, * * *." (Emphasis supplied.) Copp's United States Mineral Lands, 2d ed., p. 390.

"* * * the locators of the Silver Top could not be legally deprived of their rights by any 'juggling' of the post and monument, * * *." Tonopah & Salt Lake Min. Co. v. Tonopah Min. Co., C.C.1903, 125 F. 408, 418.

"* * * *When the location is one sufficiently marked upon the surface, so that its boundaries can be readily traced, and all the other acts of location are performed as required by law, the right of possession becomes fully vested in the locator, and cannot be divested by the removal or obliteration of the stakes, monuments, marks, or notices, without the act or fault of the locator,* * * *." (Emphasis supplied.) Book v. Justice Min. Co., C.C.1893, 58 F. 106, 114.

Although Pollard v. Shively, 5 Colo. 309, 318, 319, says it is necessary that a locator keep up his boundary posts in order to benefit by the rule giving control to markings on the ground, that holding is in direct conflict with innumerable decisions deciding that once the boundaries of a claim are properly marked, the rights of the locator are fixed, determined and vested and cannot be defeated by the obliteration or destruction of those markings. The Pollard pronouncement necessarily adopts a doubtful premise, for it seemingly assumes

the sole purpose of ground markings is to give notice to other potential locators. That ignores the laws of the United States where the title to the land resides. The federal laws require only that the ground be marked in order to vest a locator's *right* to the claim. That a notice of location be also recorded is desirable, and our statutes so provide. But this provision of our law is inadequate *to work a forfeiture* of a locator's vested right. Much less may it be said that the recording of a faulty notice of location will forfeit the locator's rights.

The Pollard decision, supra, literally begs the question of conflicts between recorded notices of location and ground markings. The huge weight of authority resolves such conflicts in favor of ground markings. The adoption of the Colorado court's holding would throw wide open the door to fraud, because in every case of faulty recorded notice a person could surreptitiously remove, destroy and obliterate another's ground markings and smugly say, "How was I to know? There were no markings to notice me the land was located." So, if the majority holding hinges on the Pollard case, every locator of Wyoming mining claims should be warned that henceforth a twenty-four-hour-a-day watch, the year round, must be kept over each located claim markings. Otherwise they will risk discovering too late that because their recorded notice of location is somewhat defective their rights will be forfeited.

It seems uncontrovertible that if the recorded notice is not examined by an adverse claimant, he has not been misled by it. There was not one word of testimony or other evidence that the appellant was misled by the recorded defective notice of location or that he even saw or examined the recorded notice. 2 Lindley on Mines, 3d ed., § 383, p. 910.

The vital error in reversing the trial court in this case is that to do so forfeits a valuable vested right of the appellees solely because no *constructive* notice gave the true description of Sue 3. No account is taken of the fact there is substantial evidence in the record to justify the lower court in concluding the appellant had *actual* notice the area was claimed by the appellees.

This court has heretofore spoken on this point when in Hagerman v. Thompson, 68 Wyo. 515, 530–532, 235 P.2d 750, 755, 756, it said:

"* * * Judging from the cases generally, however, if a location is merely defective, then the courts are inclined to hold that defects are cured when a subsequent locator has knowledge of the prior location * * *."

The same opinion notes with apparent approval:

"* * * One of the rules is stated in 2 Lindley on Mines, Section 381 where the author says: 'In the initiation of rights upon public mineral lands, as well as in the various steps taken by the miner to perfect his location, his proceedings are to be regarded with indulgence, and the notices required invariably receive at the hands of the courts a liberal construction.' * * *"

Our court also quoted Steele v. Preble, 158 Or. 641, 77 P.2d 418, 428, where it was said:

"* * * 'The purpose of posting a notice and marking the boundary lines is to inform and guide others who may wish to make locations in that vicinity. But one who has knowledge of the boundaries of a mining claim cannot complain of the absence of stakes, monuments, etc., which are intended to identify the boundary lines. * * * Likewise, he cannot complain because of a defect in the posted notice. * * * Accordingly, a mere defect in the lines or notices could avail the defendants nothing.' * * *"

Even without other evidence in the record which tended to show the appellant had such actual knowledge that Sue 3 had been located by the appellees on the identical ground previously staked as the abandoned

Campbell 1, the appellant's own testimony was sufficient to disclose he did have that actual knowledge of the true location of Sue 3. Appellant admitted he saw a pit and filled it up, although he stated he did not recognize it as a discovery hole; that the hole was a "pit" dug and fenced 40 to 50 feet east of his own previous discovery pit; that he put a notice where the "pit" was, saying in part, "You are trespassing. I am calling the law", and that the appellees' discovery pit was outside the Sue 3 as described in the recorded notice of location. All these facts, circumstances and admissions taken together gave ample reason to believe the appellant had actual knowledge of the location made upon the ground by the appellees.

In Globe Mining Company v. Anderson, 78 Wyo. 17, 45–47, 318 P.2d 373, 384, 385, the writer of the majority opinion in this case also discussed at some length the significance of statutes providing for the recording of a certificate of location. By quotation of authority, the premise was seemingly accepted that such statutory requirements for recording location notices were merely directory. This indicates the writer of that opinion then deemed that the certificate of location as recorded was not of controlling importance and if the complaining party had knowledge of the existence of the contested claim such party "will not be heard to raise an imperfect recordation of certificates of location as a defect of which they can take advantage." Emphasis is given to that conclusion by the opinion's further statement:

> "For us to hold otherwise would be a repudiation of our often expressed view that where a locator attempts in good faith to comply with the law the courts are inclined to be liberal in construing his acts so as not to defeat his claim by technical criticism. * * *"

It also seems appropriate to mention the majority takes little account of the court's viewing the disputed area where the judge could see for himself if the country was level or rugged; whether it was overgrown with vegetation or barren; whether a stake or other ground marking was clearly visible at the maximum distance of 432 feet, the greatest distance there was between the ground marking and the recorded description. The majority decision in this case necessarily finds that it was improbable, if not impossible, for an alert person to discover such a marking stake at a distance of less than an ordinary city block, or to see evidence of a filled-in discovery pit, and so be put upon actual notice that a mining claim had been located.

Not the least of my disagreement with the majority opinion is its repudiation of the age-old holding of this court, and an almost inviolate maxim of appellate function, that the reviewing tribunal will not assume to substitute its judgment for that of the trial court if there is any substantial evidence which justifies its finding of fact below. That finding of fact was that the Sue 3 covered the identical ground marked on the ground by the stakes of Campbell 1. While the majority, in one breath, seem to accept the fact that Sue 3 was marked on the ground as the identical area indicated by the markings of Campbell 1, the majority then proceed to adopt the testimony of a surveyor showing the Sue 3 claim was in a different place than Campbell 1. This is justified on the tenuous theory that the plaintiffs' testimony was inferior in quality to that of the surveyor's notwithstanding the court's different reaction. It amounts to holding this court is privileged to substitute its judgment for that of the trier of fact.

Recognition is also given to the appellees' contention that the judgment in the quiet title action between the same parties concerning the claim Sue 3 was res judicata. It is true that judgment did not describe Sue 3 by metes and bounds or by courses and distances, but only quieted title in a claim known as Sue 3. In consequence, there was left to be determined in the instant action only the exact area on the ground of Sue 3. When, in the instant action, it was definitely ascertained

that Sue 3 as it had been marked upon the ground was identical with the area marked by the boundary and location stakes of Campbell 1, the force of the quiet title action immediately established itself with relation and with respect to that particular area of ground and the title to it as a valid mining claim was not subject to further determination.

Finally, considerable comfort and satisfaction is taken from that portion of the Revised Statutes of the United States, reported in 30 U.S.C.A. § 34, reading as follows:

> "* * * Where patents have issued for mineral lands, those lands only shall be segregated and shall be deemed to be patented which are bounded by the *lines actually marked, defined, and established upon the ground by the monuments* of the official survey upon which the patent grant is based, and the United States supervisor of surveys in executing subsequent patent surveys, whether upon surveyed or unsurveyed lands, shall be governed accordingly. The said monuments shall at all times *constitute the highest authority as to what land is patented,* and in case of any conflict between the said monuments of such patented claims and *the descriptions of said claims* in the patents issued therefor *the monuments on the ground* shall govern, and erroneous or inconsistent descriptions or calls in the patent descriptions shall give way thereto. R.S. § 2327; Apr. 28, 1904, c. 1796, 33 Stat. 545; Mar. 3, 1925, c. 462, 43 Stat. 1144." (Emphasis supplied.)

Thus by statute the Congress of the United States has made plain that with respect to even so solemn an instrument as a patent, the description of record by courses and distances is to give way to the actual markings made upon the ground. We would do well to follow this precept.